MAX KAPLAN v. INDEPENDENT SCHOOL DISTRICT OF
VIRGINIA AND OTHERS.[1]

April 22, 1927.

No. 25,459.

**Teacher's reading in school extracts from Old Testament of King James
version not unconstitutional.**

No constitutional provision is infringed by the practice adopted by
the school board of a public school whereby each room is provided with
a copy of King James version of the Bible from which the teacher is
required to read, without note or comment, extracts from the Old
Testament, selected by the superintendent; pupils who do not desire to
listen thereto being permitted to retire while such extracts are read.

Constitutional Law, 12 C. J. p. 943 n. 69.
Schools and School Districts, 35 Cyc. p. 1126 n. 44, 46, 47; p. 1127 n. 48,
49, 50.

See note in 5 A. L. R. 866; 20 A. L. R. 1351; 31 A. L. R. 1125.

Action in the district court for St. Louis county to enjoin the
reading in the public schools of the city of Virginia of certain por-
tions of the Old Testament without note or comment, pupils not
desiring to listen being permitted to retire while such extracts are
read. Plaintiff appealed from a judgment, Freeman, J., entered in
favor of the defendants. Affirmed.

*Archer & Rosemeier* and *S. L. Cohen,* for appellant.
*Abbott, MacPherran, Dancer, Gilbert & Doan,* for respondents.

HOLT, J.
The school board of the independent school district of Virginia,
Minnesota, was requested by the Ministerial Association of that city
to place a copy of the Bible in every schoolroom and to direct the
superintendent to make suitable selections to be read daily without
note or comment by the teacher in each room at the opening of school.

[1]Reported in 214 N. W. 18.

In the request it was asserted that our nation was founded upon Christian principles; that the association had a firm conviction that this nation can prosper only when its citizenship is guided by the teachings of the Bible and that the youth of the community will receive moral and spiritual help therefrom. By resolution the school board concurred in the resolution or request presented by the association, provided each schoolroom with a copy of what is known as King James version of the Bible, the superintendent made suitable selections from the Old Testament only, and of those selections a portion is read by the teacher in the lower grades at the opening of school each morning, and in the upper grades at some time during the day. Where a parent of any pupil or the pupil objects to listening to such reading he may retire from the room. The parents of the children attending the school include Protestants, Roman Catholics, Christian Scientists, and Jews. This action was brought to enjoin the reading of these selections in the schools. The court after finding the above stated facts, in substance, found:

"That the purpose of the defendant school board in having the Bible read in the public schools was to implant in the minds of the pupils higher moral and ethical standards and a knowledge of the Bible and was not for the purpose of teaching the doctrines of any particular religious sect."

And as conclusions of law:

"That the reading of the Bible in the public schools does not constitute any infringement of the plaintiff's constitutional rights and is lawful,"

and denied the injunction with costs.

A motion for amended findings or a new trial was denied, and plaintiff appeals.

This state has from the beginning fostered public schools, deeming the education of its citizens essential to their own happiness and welfare, to the peace and prosperity of the nation, and to an intelligent participation in the government of a republic and a proper exercise of the right of suffrage. The constitutional provision here-

after quoted enjoins the legislature to provide the needed means; and a system of education has been established from the primary school to the university with its various departments, all supported by taxation and original grants from the nation. What is to be taught and the method of conducting the schools and institutions of learning have in the main been left to the judgment of the local school boards, supervised by the county and state superintendents, and by constituted boards and faculties. The legislature has, however, seen the need of moral training and of instruction in the care of body and mind. Section 2906, G. S. 1923, reads:

"The teachers in all public schools shall give instruction in morals, in physiology and hygiene, and in the effects of narcotics and stimulants."

What more natural than turning to that Book for moral precepts which for ages has been regarded by the majority of the peoples of the civilized nations as the fountain of moral teachings? A Book thus characterized by Justice Story in Vidal v. Girard's Executors, 2 How. (U. S.) 127, 11 L. ed. 205:

"Why may not the Bible, and especially the New Testament, without note or comment, be read and taught as a divine revelation in the college—its general precepts expounded, its evidences explained, and its glorious principles of morality inculcated. * * * Where can the purest principles of morality be learned so clearly and perfectly as from the New Testament?"

It may be truthfully asserted that no more exacting rules of obedience to constituted civil authority and of right living conducive to good will among men exist anywhere than those found in the New Testament of the Bible—rules to which neither Jew nor atheist can reasonably take exception. If this be true, and we think it is, the only thing with which this court is concerned is whether the practice adopted by authorities of this school, as above stated, infringes any constitutional rights of appellant. The only provisions invoked are art. 1, § 16, and art. 8, § 3, of the constitution of this state reading:

"The right of every man to worship God according to the dictates of his own conscience shall never be infringed, nor shall any man be compelled to attend, erect, or support any place of worship, or to maintain any religious or ecclesiastical ministry, against his consent; nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishment or mode of worship; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of the state, nor shall any money be drawn from the treasury for the benefit of any religious societies, or religious or theological seminaries."

"The legislature shall make such provisions, by taxation or otherwise, as, with the' income arising from the school fund, will secure a thorough and efficient system of public schools in each township of the state.  But in no case shall the moneys derived as aforesaid, or any portion thereof, or any public moneys or property, be appropriated or used for the support of schools wherein the distinctive doctrines, creed or tenets of any particular Christian or other religious sect are promulgated or taught."

We shall not stop to discuss whether or not this is a Christian nation; it is enough to refer to such discussion in the decisions hereinafter cited.  However, we think it cannot be successfully controverted that this government was founded on the principles of Christianity by men either dominated by or reared amidst its influence.  In passing we may say that no great weight should be given the fugitive statement, found in a treaty of early times with a pirate nation, as an authority on constitutional law.  Nor is there anything in substance in the complaint that public funds are diverted to sectarian teaching by reading the short extracts from the Bible, or in the fact that the different Bibles have headings to chapters. These complaints seem trivial.  They could never have been thought of by the framers of or those adopting the constitution.

Religion is based on a belief in and accountability to God, a Supreme Being.  This the state constitution recognizes in its very

preamble; and article I of the amendments to the federal constitution indirectly does the same in that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." We do not think there is good reason for making fine distinctions between the constitutional provisions of the different states, aimed to secure and protect religious liberty. It is no doubt true that, at the time the original states adopted their constitutions, society was more permeated by intolerance tending to active persecution of those deviating in religious views and practices from the majority than has been the case later in our history when this state adopted its constitution. Although most of the early settlers came here to escape religious persecution, they themselves at times became persecutors. However, in framing state constitutions the idea was dominant to protect religious liberty. Divine worship according to the dictates of the individual conscience was deemed essential to the welfare of every person and of importance to the state, by the peoples of every state. The main purpose was to protect the sincere worshipper, no matter of what sect, against persecution, to prohibit the majority from using the government in any form to further any sect or church, or coerce any citizen into any religious views or practice. It may be true that some constitutions indicate what particular act infringes religious liberty, and when it does it must be given effect. The supreme court of Washington held this provision: "No public money or property shall be appropriated for or applied to any religious worship, exercise, or instruction," prohibited the state board of education from allowing high school students examination and credit for Bible study acquired outside of the public school. State v. Frazier, 102 Wash. 369, 173 Pac. 35, L. R. A. 1918F, 1056. Except in that state, the constitutions of the other states, where the question like the one now before us has been decided, are not materially different from our own.

Appellant urges the interpretation placed by the Wisconsin court upon its constitution as controlling on the ground that ours, containing the same provisions, was presumably adopted because of our territorial connection with that state, and hence we ought to

follow its court.  The decision relied on was rendered long after the adoption of our constitution and can have no more weight than the well considered cases of that great court is entitled to upon any subject decided, and as such we have weighed it.  We have also given due consideration to the argument of practical construction in that the attorney general, whose duty it is to counsel the school authorities as to the law, some 30 years ago, advised that to open the school with the Lord's Prayer or the reading of Scriptures was violation of the constitution.  This opinion indicates an adoption of the view of the supreme court of Wisconsin in State ex rel. Weiss v. School District, 76 Wis. 177, 44 N. W. 967, 7 L. R. A. 330, 20 Am. St. 41.  However, it appears that other attorneys general, prior to that decision, had held (Op. Attys. Gen. 1858-1884, pp. 83 and 229) that reading from the Bible was within the complete control of the school authorities.  The practical construction of the constitutional provisions thus emanating should not have great weight in the determination of the question by the court, for no one can be said to have acquired any rights in respect to religious liberty or in respect to property in reliance on such construction which might be lost to him by nonadherence thereto.

We are not concerned with nice distinctions between sects, nor as to how among them the different authorized versions of the Bible are regarded.  We take notice that they are at variance.  But we do feel that the intolerance which drove so many to seek an asylum in America has gradually abated and is not now so intense.  This intolerance touching religion, the Bible, or certain scientific lines of study is not confined to the Christian or to the orthodox Jew, but it seems to grip the atheist and the disbeliever as intensely.  Speaking for myself only, I think that instead of fostering this spirit of intolerance by a strained construction of the constitution so as to exclude from use by public schools of any book proclaiming great moral precepts, it is more desirable that a liberal construction be adopted to the end that even in the public school the pupils perceive that there is that in our principles of government which recognizes the religious element of man and guarantees protection to its free

exercise and culture, and that divergent views of others concerning religion and worship should be tolerated and respected so long as there is no effort made to teach or induce any pupil to adopt them. But the practical effect of the practice of the school board in the instant case is not of great weight on the question before us. Some of the members of the court who concur in the view that such practice does not infringe the constitutions of the state or nation deprecate the same as a cause of needless friction in the community.

It is claimed that reading extracts from the Bible, as here done, is worship and converts the schoolhouse into a place of worship contrary to the constitutional provision, "nor shall any man be compelled to attend, erect, or support any place of worship." We submit it to be a strained construction to hold that because the teacher reads a short extract from the Bible each day the schoolroom is converted into a place of worship. The daily sessions of congress and of the legislature of this state and other states, from time immemorial, have opened with prayer; the army and navy have been provided with chaplains, at great expense; the same has been done for the penal institutions; yet no one has had the temerity to point to any constitutional infringement therein, nor to contend that the halls of congress or of the legislatures or penal institutions have been converted into "places of worship." The phrase above quoted, considered by itself as well as in connection with the rest of the section, indicates clearly that this refers to church buildings or places devoted exclusively or primarily to worship by persons of one faith or sect banded together. Nor, except by a strained and narrow construction, can it be claimed that because the few minutes the teacher reads the extracts mentioned there is an expenditure of public funds forbidden by these provisions of the sections of the articles above quoted, viz.:

"Nor shall any money be drawn from the treasury for the benefit of any religious societies, or religious or theological seminaries," * * * "But in no case shall the moneys derived as aforesaid, or any portion thereof, or any public moneys or property, be appropriated or used for the support of schools wherein the distinctive doc-

trines, creed or tenets of any particular Christian or other religious sect are promulgated or taught."

It is plain that the last is intended to prevent school moneys from being appropriated for denominational schools and to prevent the teaching of the distinctive doctrines of any sect or creed in the public schools maintained by the state.   The first as clearly refers to the appropriation of public funds of the state for the benefit of religious societies, and for religious or theological seminaries; and certainly this school as conducted cannot possibly come within any of those definitions without doing violence to the letter and spirit of the provision.

In addition to the Washington and Wisconsin decisions cited, the courts of Illinois in People ex rel. Ring v. Bd. of Education, 245 Ill. 334, 92 N. E. 251, 29 L. R. A. (N. S.) 442, 19 Ann. Cas. 220, and of Louisiana in Herold v. Parish Board, 136 La. 1034, 68 So. 116, L. R. A. 1915D, 941, Ann. Cas. 1916A, 806, held that the reading of extracts from the Bible in the public schools infringes constitutional provisions, in substance, like ours.   On the other hand, like provisions have been held not.to forbid the practice adopted by the school board in the instant case:   Wilkerson v. City of Rome, 152 Ga. 762, 110 S. E. 895, 20 A. L. R. 1334; Moore v. Monroe, 64 Iowa, 367, 20 N. W. 475, 52 Am. St. 444; Knowlton v. Baumhover, 182 Iowa, 691, 166 N. W. 202, 5 A. L. R. 841; Billard v. Bd. of Education, 69 Kan. 53, 76 Pac. 422, 66 L. R. A. 166, 105 Am. St. 148, 2 Ann. Cas. 521; Hackett v. Brooksville Graded School District, 120 Ky. 608, 87 S. W. 792, 69 L. R. A. 592, 117 Am. St. 599, 9 Ann. Cas. 36; Donahoe v. Richards, 38 Me. 379; Spiller v. Woburn, 94 Mass. 127; Pfeiffer v. Bd. of Education, 118 Mich. 560, 77 N. W. 250, 42 L. R. A. 536; Freeman v. Scheve, 65 Neb. 876, 91 N. W. 846, 93 N. W. 169, 59 L. R. A. 927 (the final opinion which holds that the Bible is not proscribed from the public school by its constitution); Nessle v. Hum, 1 Ohio N. P. 140; Bd. of Education v. Minor, 23 Ohio St. 211, 13 Am. Rep. 233 (holding that it is exclusively within the jurisdiction of the school board to exclude the Bible, inferentially holds that such board could direct reading therefrom, though the wisdom of so doing is ques-

tioned in impassioned terms); Curran v. White, 22 Pa. Co. Ct. 201; Church v. Bullock, 104 Tex. 1, 109 S. W. 115, 16 L. R. A. (N. S.) 860.

We do not intend to extend this opinion by quotations from these various decisions wherein, on both sides of the question, great enthusiasm and eloquence has been brought to the aid of drawing fine distinctions in the reaching of conclusions, many of which, we think, never entered the minds of the framers of the constitutional provisions involved or of the people in adopting them. These opinions furnish interesting reading, and in connection therewith reference may be made to the opinions of such eminent authorities as Cooley, Const. Lim., p. 578 (6th ed.), and Edward Thomson in his article on The Relation of Religion to Our Government, Case and Comment of January, 1914.

In the main opinion in the Weiss case it is said that the court's conclusions do not "banish from the district schools such text-books as are founded upon the fundamental teachings of the Bible, or which contain extracts therefrom. * * * Such text-books are in the schools for secular instruction, and rightly so; * * *. It may also be used to inculcate good morals,—that is, our duties to each other,—which may and ought to be inculcated by the district schools. No more complete code of morals exists than is contained in the New Testament, which reaffirms and emphasizes the moral obligations laid down in the ten commandments."[1]

If textbooks may be used containing extracts from the Bible without violating the constitutional provisions, why may not selections therefrom made by the school authorities? It may also be said to be difficult to reconcile the ruling of the Illinois court in North v. Bd. of Trustees of the University of Illinois, 137 Ill. 296, 27 N. E. 54, with this part of the syllabus in the Ring case:

"The reading of the Bible in the public schools constitutes the giving of sectarian instruction, within the meaning of § 3 of art. 8 of the constitution."[2]

Nevertheless, the North case was not overruled, where it was held that the practice requiring students at the university to attend daily chapel exercises where members of the faculty read a portion

___

[1] [76 Wis. 195.]     [2] [245 Ill. 334.]

of the New Testament, repeated the Lord's Prayer, occasionally gave brief morning talks, and where religious hymns were sung, the exercises not occupying more than five or ten minutes, was not prohibited by the constitution or laws of the state, it appearing that those who signed a request to be excused from attending were excused. The constitutional protection should be the same for the youth as for the child. We think Justices Hand and Cartwright, who wrote a strong dissent in the Ring case, came to the correct conclusion that the Bible is not sectarian within the purview of the constitution, and that reading excerpts therefrom in the school does not convert it or the building to a place of worship within the meaning of that document, and that whether it may be read or not read rests with the local boards. In the course of the dissent this observation is made:

"The constitution is not directed against the Bible, but applies equally to all forms and phases of religious beliefs. If the Bible is to be excluded because it pertains to a religion and a future state, heathen mythology must go with it. Moral philosophy must be discarded because it reasons of God and immortality, and all literature which mentions a supreme being, or intimates any obligations to him, must be excluded. We cannot conceive that the framers of the constitution, or the people, intended that the best and most inspiring literature, history and science should be excluded from the public schools, so that nothing should be left except that which has been sterilized, so as not to interfere with the beliefs or offend the sensibilities of atheists."[3]

The courts of California have also held in Evans v. Selma Union High School District, 193 Cal. 54, 222 Pac. 801, 31 A. L. R. 1121, that the Bible is not sectarian so as to be excluded from the school libraries.

As to the wisdom of the practice of reading extracts from the Bible, we do not desire to express an opinion, for that is left to the local school board. So long as no pupil is compelled to worship according to the tenets of any creed, or at all, and no sectarian belief is taught, courts should not hold that there is any violation of the constitutional guarantee of religious liberty. It may be interesting

[3] [245 Ill. 376.]

to note that the legislatures of several states, having constitutional provisions similar to ours, have enacted statutes to the effect that the Bible shall not be excluded from the public schools because thereof.

We deem the findings of fact sustained and the conclusions of law of the learned trial court correct.

The order is affirmed.

DIBELL, J. (concurring).

I concur in the view that the constitutional rights of the plaintiff are not invaded by the proposed readings from the Old Testament within the limits fixed. The authorities are in substantial accord to that effect. The constitutional question is the only one. The determination of policy, within constitutional limits, is legislative in character, and if we have views relative thereto they are individual and not judicial. I do not agree with all that is said in the opinion.

STONE, J. (concurring).

I concur in the result because I discover in the case nothing more than an effort to install a method of conscience training which is not open to constitutional objection.

The reasons for that view formulate themselves to me along these lines. All must agree that there is an ignorance of conscience as objectionable and dangerous as ignorance of mind. It is therefore the function of education to develop conscience as well as mind. Youth particularly needs instruction of conscience as well as intellect. Liberty of conscience, whatever else it may mean, does not include license to remain wholly ignorant. It has, relatively, no broader scope than freedom of intellect. Liberty of conscience no more than liberty of thought bars education. Both do prevent all attempts, so far as public schools are concerned, to give instruction of mind or conscience any definite sectarian or religious design.

It is my present impression that it is simply considerate and tactful, rather than legally necessary, to permit certain children to absent themselves during the scripture reading. It does not follow

from the fact that such reading is legitimate that the attendance of all should be compelled. It ought to follow however that there is no legal and particularly no constitutional objection to such compulsion if it should be attempted.

The Bible can be used in the public schools so as to interfere with the rights of conscience or so as to give a preference to one faith or sect. But it can be used legitimately. And, so far as our constitutions go, any version of it may be so used, as may be also the Talmud, the writings of Confucius, or those of any other preacher of the principles of righteous personal conduct. Whatever the text, until it is so used as to teach "distinctive doctrines, creed or tenets" of religion or to convert the school for the time being into a place of worship, no constitutional limitation will be transgressed—at least so it seems to me. It is the difficulty of using the Bible without giving the instruction a sectarian bent that makes the wisdom of its use in public schools questionable. But that goes to considerations of policy rather than legality and, as has been said already, we are not the arbiters of policy. It has not been made to appear in this case that any attempt is or will be made to teach any distinctive doctrine, creed or tenet. We must assume there will be no such effort.

If the state constitution be given a four corners construction, as it should be, effect must be given to the attempt by § 16 of art. 1 to keep "the liberty of conscience hereby secured" from resulting in any "practices inconsistent with the peace or safety of the state." The absence from the training of youth of any instruction in ethics and good morals is distinctly a practice "inconsistent with the peace or safety of the state." The fact is that any teacher who is not, along with his own branch of learning, constantly teaching the manner and wisdom of right personal conduct is so far falling short of both the duty and opportunity of his job that he ought not to have it. Therefore, when teachers resort to any text for the purpose of ethical as distinguished from religious instruction, courts should require rather clear proof of the violation of constitutional limitations or guaranties before interfering. No such proof has been presented in this case.

WILSON, C. J. (dissenting).

I agree that the reading of the Bible in the schools does not require a taxpayer to "support any place of worship."

The constitution not only says that every man may "worship God according to the dictates of his own conscience" but it says "nor shall any control of or interference with the rights of conscience be permitted."

"Rights of conscience" means what? By conscience we mean that internal conviction or self-knowledge that tells us that a thing is right or wrong. It is that faculty or power within us which decides on the right or wrong of an act and approves or condemns. It is our moral sense which dictates to us right or wrong. Each person is governed by his own views. The "rights of conscience," in religious matters, means the privilege of resting in peace or contentment according to one's own judgment. It is a recognition of a right to religious complacency.

He may not only worship as his conscience dictates but surely he also has a right not to be annoyed by those things which directly interfere with what he genuinely believes is wrong even though they act only upon an incidental but, to his mind, important angle of his way of worship. Of course the thing of which complaint is here made will not directly prevent him from worshipping God according to the dictates of his own conscience when he is in his own sanctuary or home but how soon will it pervert the child from the parental belief? No one knows. But that is not the important point. It is this. He at least sincerely believes that there is danger of this result and he worries. He is dissatisfied and discontented. Why? Because something is being done which to him is a real "interference with the rights of conscience" which the constitution expressly says shall not be permitted. If this constitutional barrier to unfortunate controversies must be broken down, it should be by a constitutional amendment, rather than have the evil at which the constitution was aimed break out, with its ancient vigor, through judicial construction.

To require the Jewish children to read the New Testament which extols Christ as the Messiah is to tell them that their religious

teachings at home are untrue.   There they are taught a denial of Christ's divinity and resurrection.   Is it possible that this does not interfere with the "rights of conscience" of the parent and, perhaps, of the child?

The Catholic people do not believe it right to have a Bible read to their children in the absence of the light of construction placed thereon by their church.   Are these people to be content to have a Bible read which substantially ignores the doctrine of purgatory which is one of their vital beliefs?   On the contrary, may a Catholic school board have the Catholic version of the Bible read disclosing the theory of purgatory as indicated in the Book of Maccabees and not interfere with the "rights of conscience" of Protestants?   The Catholic church objects not only to the King James version of the Bible, but also to its votaries reading any Bible except their own version with its copious annotations explanatory of the construction made by their church.   They subordinate the Bible to the church, while Protestantism is a Bible Christianity.   In the eyes of the Catholic, therefore, the use of the Bible in the school is in effect an indorsement of Protestantism and a repudiation of Catholicism.   Is this the religious freedom contemplated by the constitution?   I think not.   Is there not an interference with the "rights of conscience" when we read in our schools a Bible whose dedication assails the Pope as the "man of sin" and accuses him of desiring to keep the people in ignorance and darkness?   The Catholic considers, and well he may, that the Bible is read in a spirit of worship.   In a spirit of devotion.   In a spirit of prayer.   That its reading is the equivalent of prayer.   In a spirit of seeking God's blessing and guidance in the school work.   They regard the reading of the Bible as an evangelical religion.   It cannot be said that such belief is without foundation.   But regardless of actuality how may we take unto ourselves the prerogative of saying there is not an interference with the rights of conscience?"   Such, to my mind, necessarily follows.   Otherwise this language is meaningless and its application a conundrum or an enigma.

To excuse some children is a distinct preference in favor of those who remain and is a discrimination against those who retire.   The

exclusion puts a child in a class by himself. It makes him religiously conspicuous. It subjects him to religious stigma. It may provoke odious epithets. His situation calls for courage. As said in 76 Wis. 199, 200:

"When  *  *  *  a small minority of the pupils of the public school is excluded, for any cause, from a stated school exercise, particularly when such cause is apparent hostility to the Bible which a majority of the pupils have been taught to revere, from that moment the excluded pupil loses caste with his fellows, and is liable to be regarded with aversion and subjected to reproach and insult." Such practice "tends to destroy the equality of the pupils which the constitution seeks to establish and protect, and puts a portion of them to serious disadvantage in many ways with respect to the others."

The resulting hurt to the parent, as well as to the child, is a humiliation which I attribute to an "interference with conscience." It is not for me to say that he who differs with me has an ignorant conscience.

No man must feel that his religion is tolerated. His constitutional "rights of conscience" should be indefeasible and beyond the control or interference of man. The constitution says so. We all want unfettered "rights of conscience" but we must recognize the equally sacred privilege of our neighbor to have the same rights. This is more appreciated if we will remember that the language of our constitution is a limitation and not a power.

The authorities cited in the opinion to support the major conclusion are based upon constitutional language so different from ours that to my mind they do not offer substantial support to the conclusion reached. The constitutions of Georgia, Iowa, Maine, Michigan and Nebraska contain no such language as we have to construe.

Texas, Massachusetts, Kentucky and Kansas do have similar language but the decisions cited from those states do not assume to construe or rest upon it. In Texas it was held that the reading of the Bible in the school did not make the school a "place of worship" or "sectarian." In Kentucky it was held that the Bible was not "sectarian" and that its reading did not make the school a

"place of worship" nor its teachers "ministers of religion." In Kansas it was said that repeating of the Lord's Prayer and the Twenty-third Psalm without response, comment or remark did not constitute religious service or teaching sectarian or religious doctrine. This is sufficient to show the slight applicability of the authorities cited.

No decision pro or con has thoroughly considered the construction of the specific language, "nor shall any control of or interference with the rights of conscience be permitted." We have an opportunity here to construe this language. The majority opinion has ignored it. It should be construed in accordance with the best interests of the people. This permits but one conclusion.

PRACTICAL CONSTRUCTION. G. S. 1923, § 2848, makes the opinions of the attorney general as to school matters controlling law until overruled by the courts. In 1895 the then distinguished attorney general, H. W. Childs, in construing the constitution, gave his opinion to the effect that the reading of the Bible in the public schools was unconstitutional. This was followed and affirmed by a subsequent attorney general in 1913. For more than 30 years last past the officers whose duty it was to supervise the public schools of this state have uniformly followed that construction. Such executive construction has been recognized as the law during that time. It occurs to me that we should adhere to the doctrine of practical construction as recently announced by this court in County of Hennepin v. Ryberg, 168 Minn. 385, 210 N. W. 105. Practical construction supposedly comes to the assistance of public welfare. The conclusion reached will necessarily be the source of much religious strife. It was the intention of the men who framed our constitution to avoid all of the evils of religious controversies. There is no fight like a religious fight. The conclusion now reached offers a new qualification for members of local school boards and injects into school elections an element which will be detrimental to the general welfare. It is indeed the beginning of religion in our civil affairs. This decision will not settle anything. It merely adds fuel to the flames.