STATE, ex rel FINGER, Appellant, v. WEEDMAN, et al, Respondents.

(226 N. W. 348.)

(File No. 6130. Opinion filed June 27, 1929.)

*John T. Milek,* of Sturgis, and *Chambers Kellar,* of Lead, for Appellant.

*John P. Everett,* of Sturgis, and *Ellwood & Knight,* of Sioux Falls, for Respondent.

BURCH, J. Defendants compose the school board of independent school district No. 8, of Meade county, commonly known as the Faith school district. In February, 1925, they ordered that the Bible be read or the Lord's Prayer be repeated, without sectarian comment, in all of the schoolrooms wherein public school

was being conducted. Pursuant to that order, passages of the King James version of the Bible were selected and read, or the Lord's Prayer was repeated, daily by the teachers in the several rooms, as an opening exercise, but no sectarian comment was made. Some 12 or 15 children of the Roman Catholic faith refused to attend the opening exercises, where such version of the Bible was read or such prayer repeated, and as a consequence thereof were expelled from the school and were not allowed to return, except upon condition that each, before returning, should sign a written apology and agreement as follows:

"Board of Education, Faith Independent School District No. 8: After being expelled from school on the 6th day of March, 1925, for disobedience to school regulations, I regret any action of disobedience and agree that, if I be admitted to the school again, I will comply willingly and cheerfully with all school regulations, including respectful attention to any scripture reading or other opening exercises that may be given. The reasons for such disobedience on the above date are that———.

"[Signed] ——————————.""

This action was brought upon the relation of the father of one of such children in the circuit court of Meade county to compel the school board by mandamus to readmit his said child to the school without an apology, and thereafter to permit the child to absent himself during the reading of the King James version of the Bible. An alternative writ was issued, a hearing on the merits had, and thereupon the court made findings of fact, conclusions of law, and rendered judgment quashing and dissolving the writ and dismissing the action. Relator appeals from the judgment and an order denying a new trial.

Appellant contends that the order and acts of respondents invade his and his son's constitutional rights. All states of the Union, as well as the federal government, have constitutional provisions calculated to secure religious freedom. Such provisions, while differing somewhat in language, have the same general purpose. The meaning of the provisions of the several Constitutions have been before the courts for construction and application to facts similar to those in this case many times. The decisions are not in complete harmony, nor the reasoning always satisfactory. The lack of harmony is to some extent due to differences in the language of

the provisions under consideration, and to what appears to be a too technical construction of such language. There is also an inherent difficulty in getting a truly judicial expression because of personal beliefs and prejudices of the judges making the decisions. The questions here presented are before this court for the first time, and the decisions of other states may be profitably considered and studied. The subject should be approached broad-mindedly, so as to uphold the spirit and purpose of the constitutional provisions, without technical reasons or construction. To do so we must have in mind the historical reasons for the constitutional guaranties. This country was not settled by men and women of no religious faith, but by people of fervent religious convictions, who were driven from their mother country by persecution because of those beliefs. They are responsible for the guaranties appearing in the Constitutions of the United States and the several states of the Union. They knew by actual experience the evils of governmental control of matters of religion, and therefore sought to secure in this country a religious freedom never before enjoyed in any country. The wisdom of their course is apparent when we consider the enlightened spiritual growth of our churches, the very general religious character of our people, the many sects existing in harmony with almost complete freedom of religious thought, and all free to worship God according to the dictates of conscience. Religion cannot be enforced by law ; it must result from honest conviction. The advantage in separation of church and state is exemplified in our highly enlightened, free, and Christian nation. Whatever may be the language of the Constitutions, the primary purpose of each is to insure religious freedom. Any act which interferes with such liberty is necessarily contrary to the spirit and purpose of the Constitution, and therefore forbidden, whether expressly named therein or not, and, on the other hand, any act which does not so interfere is not unconstitutional unless expressly enumerated. The primary purpose to be obtained is of a two-fold character, one to insure personal freedom of conscience, and the other to prevent the support of any religious organization or sect by the state through public taxation.

This being a Christian nation, controversies seldom arise over the rights of other religions as opposed to the Christian religion, but the controversies are generally between sects of the Christian

religion. Whether a Mohammedan or other believer in a religion opposed to Christianity would have the same right to object to practices tending to exalt Christianity over other religions need not here be decided. Some of the decisions seem to so hold, and use as an illustration the reading of the Koran, compared with the Bible. We can conceive some difference, and do not think such illustration apt. If the Koran was read or the prayer of a Mussulman repeated, it would not be in worship, while a reading of the Bible or the repeating of the Lord's Prayer is bound to be in a Christian nation reverenced for its religious meaning. We must take judicial notice of the character of the Bible and its meaning in this state. As said in Herold v. Parish Board, 136 La. 1034, 68 So. 116, Ann. Cas. 1916A, 806, L. R. A. 1915D, 941: "The 'lessons and truths' contained in the Holy Bible, to be taught through reading by the teachers from the Bible to the children of the school; for the purpose of teaching morality, are read and taught as teachings from the inspired Word of God Himself. To read the Bible for the purpose stated requires that it be read reverently and worshipfully. As God is the author of the Book, He is necessarily worshipped in the reading of it." To the believer the Bible is the Word of God and to all others reared under Christian influence, though not professed believers, the influence of the Bible and the reverence in which it is held is entirely different from the sacred writings of non-Christian sects.

The conclusion is inescapable that the reading of the Bible under the circumstances here disclosed was not for a secular purpose, but was, as found by the trial court, for the purpose of "increasing, improving, and inculcating morality, patriotism, reverence, and the developing of religious and Christian characters of the pupils." To use the Bible, with the explanation that it was used as a mere code of morals or a book of history, would be to affront all Christian sects; to use it without explanation would be to use it in its generally accepted character. It is hardly adaptable for use in secular instruction without comment and analysis. Appellant's counsel aptly say: "No other book is read to the pupils of a common school under such extraordinary conditions—no book of profane history, no book of poems, no book of animal life, no book of painting, architecture, sculpture, or music. 'King Lear' may be commented upon at will, but the Book of Job, the first

great drama, with its thundering passages, must be read unexplained! The Phillippics of Demosthenes, vitalizing the atrophied patriotism of his Athenian countrymen, may be discussed and debated, but not the eloquence of Paul, with its denunciation of pagan gods and its inspired defense of 'Christianity! The 'Idylls of the King' are hedged with no such limitations, but Ruth must glean in the fields of Boaz without either praise or blame, tribute or comment! How is it possible to approve the reading of.the Holy Bible ·without comment as a book of secular instruction?"

There is much force to this argument. The legitimate function of our public schools is to impart secular knowledge, and there can be no proper limitation on the comment necessary to impart such knowledge, if the subject is to be taught at all. On the other hand, under our system of 'government, religious teaching is committed to individuals and religious organizations not supported by the state, where religious books· are used with unlimited right of comment. The limitation on the right of comment discloses the purpose of the order of the school board to enter the field of religious instruction, but not into·sectarian controversy. It may seem that in the field of religion, occupied solely by sects of one religion, there should be some margin where there is no dispute between those sects; but at the outset a difficulty arises over the authenticity of the Scriptures upon which the sects are founded.

In the instant case the dispute arises over the reading of the King James version of the Bible, which is acceptable to the Protestants, but not to the Catholics. Both Catholics and Protestants profess Christianity. No other religion is involved, but the contest is between separate organizations of the same religion. The living or vital force of 'Christianity is not attacked. But the Constitutions were not intended to apply only to freedom of other religions from state support of the Christian religion, but they were more particularly intended to apply to sects of the common national religion. The persecution of our forefathers was merely one organization fighting another organization, and none of them fighting the living principles of the Bible, one trying to force on another its construction of the Bible and mode of worship. The primary object of the Constitutions was to prevent that form of persecution. No other form was threatened or feared. In the cases cited, most of the controversies arose over a reading of the King James version of

the Bible in a public school, which was objected to by Catholic pupils and their parents. Those cases are in point and worthy of our careful consideration.

In the case at bar that version was not only read, but the Catholic children were compelled to attend upon such reading under penalty of expulsion. In many of the cited cases attendance was not required, the question being whether such reading violated liberty of conscience by forcing attention to the religious beliefs of such children, although they were allowed to absent themselves from the school for the time being. Here relator contents himself with a re-instatement of his son in school, with liberty to absent himself during such reading. We call attention to this as a stronger and less technical case in his favor, though we do not feel we should confine our opinion to narrow limits.

Article 6, § 3, of our Constitution provides: "The right to worship God according to the dictates of conscience shall never be infringed. No person shall be denied any civil or political right, privilege or position on account of his religious opinions; but the liberty of conscience hereby secured shall not be so construed as to excuse licentiousness, the invasion of the rights of others, or justify practices inconsistent with the peace or safety of the state. No person shall be compelled to attend or support any ministry or place of worship against his consent nor shall any preference be given by law to any religious establishment or mode of worship. No money or property of the state shall be given or appropriated for the benefit of any sectarian or religious society or institution."

That section secures liberty of conscience with certain exceptions, and appellant does not fall within the exceptions, for it can hardly be said that absenting oneself from a reading of the King James version of the Bible is licentious, an invasion of the rights of others, or a practice inconsistent with the peace or safety of the state. It may be argued that the peace and safety of the state is enhanced by the teaching of our youth morality, reverence, and wholesome religious beliefs. Speakig for myself, I think it is; but it does not follow that a reading of the King James version of the Bible in our public schools is essential to such teaching. Respondents frankly concede that the reading of any version would accomplish the same purpose. The difficulty in reading any version in the public schools seems to be in agreeing upon the version to

be read and the person to read it. But it is not necessary, for the teaching of religion to the youth, that it be taught in the public schools. We have many churches whose function it is to teach religion. The teaching of that particular subject in public schools seems to be so fraught with difficulties and dissensions that it is not practical to undertake it. About as far as we can go in that field in the public schools without opposition is to teach that there is an All-Wise Creator to whom we owe love, reverence, and obedience, leaving to the churches other religious instruction. A review of history and a comparison of our institutions with those of other nations where religion is under state control reveals the wisdom of our policy. It will not do, by an ill-advised decision, to impair liberty of conscience so carefully safeguarded in this country.

It remains to be seen then whether the reading of the King James version of the Bible in the public schools does infringe upon the liberty of conscience of the Catholic children. Section 7659, Rev. Code 1919, provides: "No sectarian doctrine may be taught or inculcated in any of the public schools of the state, but the Bible, without sectarian comment, may be read therein." No version of the Bible is mentioned in the statute, and it may be noted that the order of the school board does not mention version. Any version of the Bible will satisfy the statute or the order of the board. But the version used was the King James version, which the court will judicially notice is a version acceptable to the Protestants, and not to the Catholics. The Douay version is the version in universal use by the Catholics. The trial court found that there is no substantial difference between the two versions. This so-called finding is challenged by appellant as a mere conclusion. If it is a conclusion, it must be supported by reason. If it is an ultimate fact, as contended by respondent, it must be supported by evidence.

To determine whether there is no substantial difference, it is necessary to consider wherein they differ. Several differences were pointed out in the evidence, and no doubt the court may take judicial notice of the contents of both versions and ascertain the differences by comparison. But whether the differences are substantial or not must depend upon the use which the Bible serves. If one were studying the two translations and comparing them with the scriptures in the original tongue, it is evident that every difference would be important and substantial to the scholar so engaged; on

the other hand, if the use was as a text-book in reading, no difference would be important. If used to teach morals, the morals of one are as elevating as the other, and there is no substantial difference; but if used for religious purposes, the materiality of the difference in language must depend upon the religious belief to be inculcated and the importance of the words to such faith.

It is well known that the Protestants do not place any great importance on differences in translations in several versions of the Bible, but they accept and use each and all versions as substantially the same, and as teaching the same fundamental doctrines; the single exception being the Douay version, in use by the Catholics. Their objection to that version seems to be that it is considered the Catholic Bible, sanctioning some of the dogmas and practices of the Catholic Church denounced by Protestants. If their aversion is well founded, that alone is sufficient evidence of a substantial difference. The Douay version contains six books not found in Protestant translations and considered apocryphal by the Protestants. Among these are First and Second Maccabees, containing passages from which the Catholics obtain their belief in purgatory. In Matthew 6:11, a sentence of the Lord's Prayer is rendered in the King James version, "Give us this day our daily bread," where the Douay version says, "Give us this day our supersubstantial bread." In Matthew 3:1, 2, the King James version is: "In those days came John the Baptist, preaching in the wilderness of Judea, And saying, 'Repent ye; for the Kingdom of Heaven is at hand.'" The Douay version translates the second verse: "Do penance, for the Kingdom of Heaven is at hand."

Penance is a sacrament of the Catholic Church not recognized at all by Protestants. Such changes give rise to bitter doctrinal controversies. Many other differences appear, which we cannot take space to note. But they have given rise to bitter controversy pertaining to the rites and practices of the Catholics, to celibacy of the priests and nuns, and to the authority claimed by the Pope. While the differences may seem inconsequential to many, they are sufficiently substantial to engender in the field of religion heated conflicts.

The King James version is a translation by scholars of the Anglican church bitterly opposed to the Catholics, apparent in the dedication of the translation, where the Pope is referred to as "that

man of sin," and in which the translators express themselves as expecting to be "traduced by Popish persons," who will malign them, because such persons desire to keep the people in "ignorance and darkness." We are satisfied that neither the evidence nor reason will justify us in sustaining the trial court's finding that the differences in the two versions of the Bible for a religious purpose are not substantial. History of the conflicts between Catholics and Protestants over those very differences refute such conclusion. It makes no difference what our personal views may be as to the importance of the controversial words. As officers of the state, speaking for the state, neither we nor the teachers of the public schools can say that one side is right and the other wrong. We must leave that to the conscience of those involved.

[ Now, as we proceed to review a few of the cases involving the same or similar questions as are now before us, we are impressed with the lack of uniformity of the decisions under Constitutions seemingly of the same import. We are more impressed with the reasoning of different judges and illustrations used to clarify their meaning. Why cannot logic be applied with uniform result? Sound reasoning from a sound premise should reach but one sound conclusion. The premise is the thing of first importance, and, searching for the premise from which the reasoning proceeds in each case, we find it differs. The broad general purpose of the constitutional provisions is to insure religious liberty. There seems to be but little difficulty, and few cases arise, except in the field of education, and there most often between the Protestants and Catholics. There must be a cause for this. Our system of government seeks to separate church and state. This can be done only where the field of operation of each is known, and each permitted to function therein.]

In the field of education it is the function of the churches to teach religion. And when we consider the theories, dogmas, beliefs, and practices evolved from a study of that subject, with the bitter dissensions between organizations over conflicting theories, we must conclude that religious freedom requires that education in that subject rest exclusively in the churches and individuals, where all are free to adopt or reject any belief or faith according to the dictates of conscience. If that is true, then the state in its functions as an educator must leave the teaching of religion to the church,

because the church is the only body equipped to so teach, and on it rests the responsibility. Bearing this in mind, there need be no shock to the moral sense, nor to our religious instincts, in barring religious subjects from our public schools and placing them where they belong, to be properly taught. Children of Catholics, Methodists, Presbyterians, Episcopalians, Baptists, or any other sect are not deprived of religious education because not taught in the public schools. To teach a class composed of all denominations just what the parents of each desire, neither more nor less, is an obvious impossibility. It may be that the child has no religious conviction, and so could be taught anything without violating its conscience; but parents with children of tender age may feel that it is their religious duty to give to the child proper religious instruction and to guard it from heresies. Consequently, if the state teaches religion, many parents will, because of their religious belief, keep their children from such teaching, and thereby be deprived of all public school privileges.

Another premise to be firmly fixed is that reading the Bible, or offering prayer, or both, in opening exercises, is devotional, a form of religious instruction, and not a part of the secular work of the school. One serious complaint made by religious people is that by excluding such exercises we thereby make our schools Godless. Such complaint argues that the converse would be true if such exercises were allowed, indicating that such exercises are considered devotional.

Starting from these two premises, we call attention to a few cases. A late case, decided in April, 1927, is Kaplan v. Ind. Sch. Dist. of Virginia, 171 Minn. 142, 214 N. W. 18, 57 A. L. R. 185. The Ministerial Association of the City of Virginia, Minn., asked that a copy of the Bible be placed in every schoolroom of the public schools of the city, and that the superintendent make suitable selection therefrom, to be read daily, without note or comment, by the teacher in each room at the opening of school. Such request was granted, and the King James translation of the Bible was read in opening exercises. The Catholics objected, and the case came before the Minnesota court upon constitutional grounds. It was held that no constitutional right of a Catholic pupil was violated. Judges Holt, Dibell, and Stone each wrote opinions sustaining the action of the school board, and Chief Justice Wilson dissented. Judge

Holt says: "We do not think there is good reason for making fine distinctions between the constitutional provisions of the different states." With this we agree.

We also agree with his statement that one of the main purposes of the constitutional provisions is to prohibit "the majority from using the government in any form to further any sect or church." But Judge Holt's opinion seems to proceed on the theory that the reading of the Bible under the circumstances disclosed was secular in its nature; that it was read as a text-book of morals. Upon this premise he reaches the conclusion that it may be so used. We think his premise wrong, and that such use of the Bible was necessarily devotional. We concede that literature, history, astronomy, geology, or any other secular subject may be taught, and that, although a knowledge of those subjects may have a tendency to modify one's religious views, it is no reason for excluding the teaching of such subjects. In the study of literature or other subjects, a quotation from the Bible may be useful in the study of the subject; but such quotation is incidental to the subject pursued, and its use is not devotional or religious; very different from its use in devotional exercises.

At the risk of being accused of repetition we emphasize that in our opinion the reading of the Bible and repeating of the Lord's Prayer without comment in opening exercises is necessarily devotional. Comment is absolutely essential to confine it to mere moral or patriotic instruction, and it would seem that a teacher would be at a loss for words to confine the prayer to nothing but moral instruction. It is in its very nature devotional. The cases sustaining Bible reading in school exercises consistently evade or ignore this fact and thereby fall into error. The line dividing secular subjects from religious subjects is no more difficult to define than many others presented for judicial determination. Judge Stone says: "All must agree that there is an ignorance of conscience as objectionable and dangerous as ignorance of mind. It is therefore the function of education to develop conscience as well as mind." From this premise he naturally arrives at the conclusion reached by a majority of the court, but his premise is faulty, in that it assumes that such instruction cannot be had, unless taught in the public schools. There has been no lack of instruction in such subjects. The Protestants are not worried for fear the Cath-

olic children will receive no religious or moral instruction. Their objection is to the quality.

Chief Justice Wilson's dissenting opinion seems to be based on the broad general principle that the Constitution guarantees religious freedom. He says: "The Catholic people do not believe it right to have a Bible read to their children, in the absence of the light of construction placed thereon by their church. Are these people to be content to have a Bible read which substantially ignores the doctrine of purgatory, which is one of their vital beliefs? On the contrary, may a Catholic school board have the Catholic version of the Bible read, disclosing the theory of purgatory as indicated in the Book of Maccabees, and not interfere with the 'rights of conscience' of Protestants? The Catholic Church objects not only to the King James version of the Bible, but also to its votaries reading any Bible except their own version, with its copious annotations explanatory of the construction made by their church. They subordinate the Bible to the church, while Protestantism is a Bible Christianity. In the eyes of the Catholic, therefore, the use of the Bible in the school is, in effect, an indorsement of Protestantism and a repudiation of Catholicism. Is this the religious freedom contemplated by the Constitution? I think not. Is there not an interference with the 'rights of conscience' when we read in our schools a Bible whose dedication assails the Pope as the 'man of sin' and accuses him of desiring to keep the people in ignorance and darkness? The Catholic considers, and well he may, that the Bible is read in a spirit of worship, in a spirit of devotion, in a spirit of prayer; that its reading is the equivalent of prayer, in a spirit of seeking God's blessing and guidance in the school work. They regard the reading of the Bible as an evangelical religion. It cannot be said that such belief is without foundation. But, regardless of actuality, how may we take unto ourselves the prerogative of saying there is not an 'interference with the rights of conscience?' Such, to my mind, necessarily follows. Otherwise this language is meaningless, and its application a conundrum or an enigma."

The judges favoring the majority opinion all express doubt as to the wisdom of the school board in taking such action, seeming to feel that it is a cause of needless friction and dissension in the school district.

In People ex rel Vollmar v. Stanley, 81 Colo. 276, 255 P. 610, decided in March, 1927, the constitutional right to read the King James version of the Bible in the public schools was involved. That case presents facts very similar to those in the case at bar, in that the Bible was not only read in opening exercises, but the Catholic children were required to attend upon the reading. The Colorado court held that the compulsory attendance was unconstitutional, but that there was no violation of any constitutional right to read the Bible, if such children were permitted to absent themselves during the exercises. The court devotes considerable time to discussing whether or not the Bible is sectarian in character, and reaches the conclusion that it is not. But it did not consider the broad ground of religious freedom. The court, therefore, seems to have failed to consider the reading of the Bible under such circumstances as an act of devotion and worship. Secular subjects are not usually taught in opening exercises. The case also turns quite largely on the discretion of the board to prescribe the subjects of study, without deciding how far, if at all, religion may be taught in public schools.

In Herold et al v. Parish Board, 136 La. 1034, 68 So. 116, Ann. Cas. 1916A, 806, L. R. A. 1915D, 941, decided in April, 1915, the court holds that the reading of the King James translation of the Bible, including the Old and New Testaments, in the public schools of the state, is a preference given to Christians and a discrimination against Jews, but reaches an opposite conclusion as to Catholics. There were three complainants, two being Jews and one a Catholic. In this holding the Louisiana court says the Catholics believe in all the Bible, and that it will not concern itself "with the differences, or alleged errors, in the different translations of the Christian Bible."

In Hackett v. Brooksville Graded School, 120 Ky. 608, 87 S. W. 792, 69 L. R. A. 592, 117 Am. St. Rep. 599, 9 Ann. Cas. 36, it was held that the King James translation of the Bible was not a sectarian book, and that a certain prayer that was offered was not sectarian. The question of religious freedom was not presented or considered. The court says: "The complaint in this case goes only to the sectarian feature of the exercises, not because they were religious." As to the sectarian feature the court says: "The book itself, to be sectarian, must show that it teaches the peculiar dogmas

of a sect as such, and not alone that it is so comprehensive as to include them by the partial interpretation of its adherents." There seems to be much force to this reasoning, so far as Christian sects are concerned. The dispute there, as in the case at bar, involved a dispute between Christian sects, and no distinct religion was involved. In this case we do not feel that the question of sectarian teaching is controlling, and do not decide that feature, preferring to put our decision on the broader ground of religious liberty.

In State ex rel Freeman v. Scheve, 65 Neb. 853, 91 N. W. 846, 59 L. R. A. 927, amplified by a second opinion on rehearing reaching the same result, 65 Neb. 876, 93 N. W. 169, 59 L. R. A. 927, decided in 1902, it was held that such exercises were unconstitutional, on the ground that it was worship and sectarian instruction.

A leading case so holding is State ex rel Weiss v. School Board, 76 Wis. 177, 44 N. W. 967; 7 L. R. A. 330, 20 Am. St. Rep. 41, decided in 1890. We do not deem it necessary to quote further from decisions. There are many holding such exercises unconstitutional, while several hold otherwise. Donahoe v. Richards, 38 Me. 379, 61 Am. Dec. 256, decided in 1854, holds such reading of the Bible constitutional, on the ground that it was claimed to be used as a text-book for reading. This seems a far-fetched excuse, when it is considered that only such pupils as were able to read it were required to participate in the reading. Texts for reading are usually used by those who need to acquire the art.

The mere selection of a disputed translation would seem to be a preference for the sects holding to such translation, and thereby aiding them in inculcating their doctrines. In O'Connor v. Hendrick, 184 N. Y. 421, 77 N. E. 612, 7 L. R. A. (N. S.) 402 6 Ann. Cas. 432, it is held the mere wearing of the garb of the sisters of St. Joseph by one of the teachers constituted in effect sectarian instruction, and this was also the view of the Iowa court in Knowlton v. Baumhover, 182 Iowa, 691, 166 N. W. 202, 5 A. L. R. 841. The Iowa court characterizes a contrary holding in Hysong v. Gallitzin Borough School District, 164 Pa. 629, 30 A. 482, 26 L. R. A. 203, 44 Am. St. Rep. 632, as a "remarkable" conclusion.

We briefly consider some of the arguments by respondents in support of their action. They say: "We contend that the Bible is not exclusively a religious work. It is a history, among other things, a philosophy, and is replete with the time-tried rules of con-

duct, which, if universally followed, would leave in this world no room for religious denominations, political parties, or even governments. Its literary and historical value is everywhere recognized. Is it not reasonable to contend that facts of history may be established in the public schools by reference to some version of the Bible?" The answer to this is that it was not so used. Nor could it well be so used without comment.

Again they say: "If the religious or sectarian features of the Bible are omitted from the reading, no one can be heard to object." Perhaps not, but the exercises were devotional, and would be worse than useless otherwise. Throughout their brief similar assumptions are used in argument, but we are not justified in so assuming for reasons heretofore stated. Respondents say: "There is a determined effort throughout the country to bar the Bible from the public schools. This effort is not being made by atheists, agnostics, and religious bolshevists, but by religionists, who for a thousand years have fought bitterly every effort to give the Bible to the people in the vernacular. They burned the bones of Wycliffe five hundred years ago to show their hatred of the man who had the temerity to defy the traditions of the church and give the Word of God in a tongue 'understanded of the people.'"

This is a striking illustration of the bitterness that can and does grow out of religious disputes. In countries where the dominant sect can control religion through the power of the state, oppression results. This state has by its Constitution said the power of the state shall not be so used. It is our duty to uphold that Constitution.] It is essential to religious liberty that one be free to worship according to the dictates of his own conscience, and not only that, but to live and teach his religion. That right cannot be taken away by the state, and it follows that such teaching must belong exclusively to the individual and voluntary organizations of such individuals. The state as an educator must keep out of this field, and especially is this true in the common schools, where the child is immature, without fixed religious convictions, and the parents' liberty of conscience is the controlling factor, and not that of the pupil. In institutions of higher learning the parents' rights become less, and the conscience of the pupil may become the controlling factor. We are not concerned at this time with the chapel services in colleges, where pupils are gathered from distant homes,

are often under direct supervision only in class hours, and where all religious denominations enter and minister to the spiritual needs of the pupils in many ways; nor are we concerned with chaplains in the army or the penitentiary, where sermons are preached. None of these are analagous, nor can they furnish apt illustrations. Nor do the facts of this case disclose an effort on the part of the state to instruct children otherwise deprived of religious instruction. No law of necessity can be invoked.] This case involves the right of the Protestants to read their translation of the Bible and conduct their form of worship in the common schools, and to compel the Catholic children to attend upon such services over the objections of their parents. On the broad constitutional ground of an infringement of religious liberty, we must hold such action unlawful.

The judgment and order appealed from are reversed, and the trial court is directed to issue the peremptory writ of mandamus according to the prayer of the complaint.

POLLEY, J., concurs.

CAMPBELL, J., concurs in result.

SHERWOOD, J. I dissent from the conclusions reached and from most of the premises assumed in the majority opinion. [The majority opinion seems to be based upon the premises that, whatever may be the language of the Constitutions, "the primary purpose of each is to insure religious freedom," and again: "The primary purpose to be obtained is of a twofold character: One, to insure personal freedom of conscience; and the other, to prevent the support of any religious organization or sect by the state through taxation." Thus the major premises of the majority opinion are made to rest on the meaning of the phrases "religious freedom" and "personal freedom of conscience."

Neither of these phrases appear in our Constitution; nor do I find them defined in the majority opinion, or in any authority to which my attention has been called. The phrase relating to religious liberty used in our Constitution is "liberty of conscience." Const. art. 6, § 3. If we assume that the phrases "religious freedom," "personal freedom of conscience," "religious liberty," and "liberty of conscience" mean substantially the same thing, we must still determine what this freedom or liberty is which is secured by the Constitution, and which must not be infringed.

Perhaps it would be impracticable, if not impossible, to give a definition of either one of these phrases which would exactly express its meaning in every place in which it was used. For example, religious liberty "does not include the right to carry out any purpose which persons see fit to claim as part of their religious system, nor to stretch their own liberty so as to interfere with the liberty of their neighbor." Frazee's Case, 63 Mich. 396, 30 N. W. 72, 6 Am. St. Rep. 310. It does not make professed religious belief superior to the laws of the state. And the state has authority to make regulations as to the time, mode, and circumstances under which parties shall assert or exercise their rights without coming in conflict with any constitutional provision. State v. White, 64 N. H. 48, 5 A. 828; Cooley's Constitutional Limitations, § 596.

It is clear from the decisions above quoted and under the decisions referred to later in my opinion, that such phrases as are used above are of doubtful meaning, and we must look to the history of the times and the state of the law as it existed when the Constitution was enacted to obtain their correct meaning. In other words, the historical interpretation must be used, if we determine what the framers of the Constitution and the people who adopted it meant.

To the argument that reading the Bible in school will deprive many children of school privileges and will cause endless strife, we call attention to the fact that at the time the first religious liberty statutes were adopted and for many years thereafter—in fact, until very recent times—the Bible was almost universally read in the public schools and was sometimes used as the reading book in the school. Donahoe v. Richards, 38 Me. 379, 61 Am. Dec. 256. In a survey made by the federal Bureau of Education in 1923 (Government Bulletin 1923, No. 15), it is shown that the Bible is now generally read in the schools of 24 states and in the schools of the city of New York. It is also read in some schools in 10 other states. It was excluded by decisions of the court in 4 states only until the majority opinion was handed down in this case. That reading the Bible in school was not unconstitutional had been decided by the courts of 7 states, each of which had Constitutions either almost identical or very similar to our own.

To the argument that the Bible is not suitable for use in the public schools I desire to quote from an address by President Hadley, of Yale University, the following: "The use of the Bible in

the schools justifies itself, because it does, in fact, give those lessons in conduct and character which we regard as fundamentally important. Wherever we have tried to make Bible reading a thing apart from the rest of the school work, which we used because we thought that the Bible was verbally inspired, we found difficulty in defending our course against those taxpayers who denied that the Bible had any such special authority, and against those others who believed that there was a church authority at least co-ordinate with the Bible. But when we make our religious and moral aim as broad as our whole field of instruction, and use the Bible as we use any other book of poetry or history, then can we justify our principles in the face of all the world, and look forward with confidence to the results which will follow the application of those principles. To sum the whole matter up: the supposed antithesis between secular training and religious training arises from a misconception of what is involved in good training of any kind. * * * When a master of a public school is occupied only with teaching facts and principles, and when a master of a religious institution is occupied only with teaching dogmas and observances, they necessarily work at cross-purposes; but the mere learning of facts and principles is not the vitally important part of secular education, nor is the learning of doctrines and observances the vitally important part of religious education. The formation of habits of discipline and the development of ideals of usefulness is the essentially important thing in good education of either kind. When we have grasped this truth, we shall see that there is in the field of education the same harmony between the true needs of the world and the true needs of the church which exist in every other department of human life."

To the argument that religion must be excluded from the public schools, I call attention to the two provisions of our Constitution which expressly teach religion. The preamble says: "We, the people of South Dakota, grateful to Almighty God for our civil and religious liberties, * * * do ordain and establish this Constitution for the state of South Dakota." And again to the motto of this state which is, "Under God the people rule." Const. art. 21, § 1. It cannot be unconstitutional to teach what the Constitution itself affirms.

To the argument that the court found Bible reading "for the

purpose of increasing, improving, and inculcating morality, patriotism, and reverence, and for the purpose of developing religious and Christian characters of the pupils of said schools, and that this stamped it as a religious exercise, and therefore in violation of the Constitution, I answer that it could not be unconstitutional to inculcate morality, because the Constitution provides that the stability of our government depends on the morality and intelligence of its people, and that schools shall be established to secure such education. Const. art. 8, § 1. Also the statute expressly provides that instruction shall be given by every teacher in the state in truthfulness, purity, public spirit, patriotism, respect for honest labor, obedience to parents, and deference to old age. Section 7631, Rev. Code 1919. The constitutionality of this statute is not questioned in this case, and while it remains unquestioned it cannot be unconstitutional to teach what the law requires should be taught.

The majority opinion affirms that this is a Christian nation, and that Christianity is our national religion, and with this I agree. If this is true, how can it be unconstitutional to seek to develop religious and Christian character among the pupils of our schools, provided, in so doing, we teach nothing sectarian, and nothing which in any way offends the devotional sense of either parent or child?

I earnestly dissent from each of the following conclusions reached in the closing paragraph of the majority opinion: "No law of necessity can be invoked in this case." Only a few days ago the President solemnly warned us that this was the most lawless nation in the world. It is common knowledge that we are in the midst of an unprecedented period of crime; that neither life nor property is safe in many places in our land. What greater necessity could be shown?

Again, the majority say: "The facts in this case do not show an effort to give religious instruction to children otherwise deprived of such instruction." But it is common knowledge that not over 43 per cent of our citizens are even nominal members of any church, and only a small portion of those, either children or adults, attend any church.

Again, the majority opinion says: "This case involves the right of the Protestants to read their translation of the Bible and conduct their form of worship in the common schools, and to com-

pel the Catholic children to attend upon such services over the objections of their parents." Since when did reading identical passages from either the Douay or King James Bible, or repeating the Lord's Prayer, common to both, become pro-Protestant or anti-Catholic worship? Both Bibles are Bibles of the Christians. The prayer offered is a prayer to the same God, and the Bible itself is not sectarian.

[The law of the land, not the Protestants, required that the Catholic children attend the Faith school. No one went there to worship, and no one was required to worship. As I view it, the real question involved is: Shall the state, through its regularly elected school board, determine what shall be taught in the public schools, or shall that be determined by the church, or some self-appointed group of persons? In other words: Is the state, the church, or some cult or faction supreme in matters of education?

It further seems to me that the majority opinion fails to point out any part of the Constitution which has been violated, or any specific right of appellant which has been infringed. The questions involved in this case are of such importance that, besides dissenting from the majority opinion, I have taken the liberty to submit the original opinion which I wrote in this case, which opinion expresses my views upon the question. That opinion reads as follows:

February 2, 1925, the board of education of independent school district No. 8, Meade county, adopted the following resolution: "That the Bible be read or the Lord's Prayer repeated in each room of the school during the opening exercises each morning: Provided that no comment whatever shall be made by those reading the Bible."

At the request of a Catholic student, made on the second morning thereafter, the superintendent announced to the entire assembly of the school: "That those who objected to this exercise might absent themselves therefrom."

About March 4, 1925, the superintendent represented to the board that confusion and disorder arose from pupils absenting themselves from such exercises. Thereupon the board passed the following resolution: "That the superintendent be instructed to see that none of the pupils in the school be absent from any of the

rooms during the reading of the scriptures at the opening exercises each morning."

The superintendent then announced to the pupils that this rule was to be obeyed, and any pupil violating it would be expelled. About 16 pupils in the high school and grades refused to obey the rule, absented themselves during the reading of the scriptures, and were expelled. Among them was Marvin Finger, the son of August Finger, relator herein.

Later the board instructed the superintendent of schools to reinstate any pupil who signed an apology and promise in the following form:

"After being expelled from school on the 6th day of March, 1925, for disobedience to school regulations, I regret any action of disobedience and agree that, if I be admitted to the school again, I will comply willingly and cheerfully with all school regulations, including respectful attention to any scripture reading or other opening exercises that may be given. The reasons for such disobedience on the above date are that ————.

"[Signed] —————————."

Thereafter this proceeding in mandamus was brought in the circuit court of Meade county to compel the board to forthwith admit Marvin Finger to school "at such time as the reading of the King James version of the Bible shall not be in progress." From a judgment in favor of defendant, and an order denying a new trial, plaintiff appeals.

Upon the trial the court found in substance: That during the month of February, 1925, the school board ordered and directed that the Bible be read or the Lord's Prayer repeated in all the schoolrooms of said district wherein public school was being conducted. Pursuant to this order the board had read at the opening of school passages of scripture from the Bible commonly known as the King James version, and in certain rooms the Lord's Prayer was repeated during the opening exercises of school in the presence of all the pupils in attendance, but that such reading was without sectarian comment. That Marvin Finger, aged about 12 years, had been in regular attendance upon the public schools maintained in said district, and resided with his father, August Finger, the relator herein. And that said relator, August Finger, and Marvin Finger were members and adherents of the Roman Catholic Church.

That the board ordered the Bible to be read or the Lord's Prayer to be repeated for the purpose of increasing, improving, and inculcating morality, patriotism, and reverence, and to develop the religious and Christian character of the pupils. That it was contrary to the faith, teaching, and dogma of the Roman Catholic Church for any Catholic to listen to the reading of the King James version of the Bible or the repeating of the Lord's Prayer, unless the Catholic version was used. That under the direction and advice of Marvin Finger's father and the Catholic priest of his parish said Marvin Finger refused to be present at the reading of the scriptures or when the Lord's Prayer was repeated, although such reading and repeating was always done without sectarian comment.

The only act of disobedience for which Marvin Finger was expelled was his refusing to be present during the time the scriptures were read or the Lord's Prayer repeated. "That the King James version of the Bible is not a sectarian book, and that the same is not substantially different under the evidence submitted herein that the Douay or Catholic version of the Holy Scriptures, and that the reading of said Bible or the repeating of the Lord's Prayer in the public schools of this state without sectarian comment is not sectarian instruction, and not in violation of any constitutional provision of this state."

The court further found that reading the Bible or disciplining pupils and expelling them for violation of the rules of the school was largely in the discretion of the school board, and could not be controlled by mandamus in the absence of abuse, and that no abuse was shown in this case. That section 7659, Rev. Code 1919, was constitutional.

From these findings the court concluded, as a matter of law, that reading the Bible or repeating the Lord's Prayer was largely within the discretion of the board of education, and was not sectarian instruction; that such reading did not bring the school within the constitutional provision prohibiting the appropriation of money for the support of a sectarian school, and that the acts of the board in compelling pupils to remain in school during the exercises of said school, including Bible reading or repeating the Lord's Prayer, or expelling them for not remaining, is wholly within the authority of the board of education, and in the absence of abuse will not be interfered with by the courts, and that no abuse has been shown.

It should be observed that reading the scriptures or repeating the Lord's Prayer from the Douay or any other version of the Bible would have complied fully with this order of the board. It does not appear from the record how the King James version of the Bible came to be selected. However, both sides tried the case in the lower court on the theory that the use of the King James version was directed by the board, and we will so consider it.

Hereafter we will refer to the King James version of the Bible as the King James Bible and the Douay version as the Douay Bible. Before discussing the main questions presented, we will consider some questions raised as to the admissibility of evidence and findings of fact.

Appellant offered in evidence the dedication or preface to the King James Bible. It was objected to as incompetent, irrelevant, and no part of the Bible. This objection was properly sustained. The dedication was no part of the Bible. There was no proof offered showing, or tending to show, that any part of it had ever been read in school, or called to the attention of any pupil. It was not authorized, much less required, to be read by the order of the school board, and was entirely irrelevant.

We agree with appellant that the court should "take judicial notice of the contents of the Bible, of the numerous sects into which the religious world is divided, and also of the general doctrines maintained by each sect." Jones, Evidence in Civil Cases, p. 173, § 130; Abbot's Proof of Facts, p. 634; 1 Greenleaf, E. §§ 5, 6; State v. Dist. Ed., 76 Wis. 177, 44 N. W. 967, 7 L. R. A. 330, 20 Am. St. Rep. 41.

Appellant contends that part of finding of fact No. 5, which reads, "The King James version of the Bible is not a sectarian book," is a conclusion of law and not a finding of fact; that as a finding of fact it is not sustained by the evidence, and as a conclusion of law it is erroneous. Substantially the same objection is made to another part of finding No. 5 and all of findings 6 and 7.

We laid down the rule by which an ultimate fact is to be distinguished from a conclusion of law in Danforth v. Coyne, 49 S. D. 153, 207 N. W. 79, citing in that opinion Levins v. Rovegno, 71 Cal. 273, 12 P. 161. In the former case we said: "If, from the facts in evidence, the result can be reached by that process of natural reasoning adopted in the investigation of truth, it becomes

an ultimate fact, to be found as such." As the court takes judicial notice of the meaning of current English words and phrases, as well as the contents of the Bible (Jones on Ev. supra), we think this part of finding No. 5 must be held a finding of fact under the authority of Danforth v. Coyne, supra.

On the same authority, that part of finding No. 6 to the effect that disciplining pupils and expelling them for violating the orders of the board is largely in the discretion of the board is a finding of fact. That part to the effect that such discretion cannot be controlled by mandamus, together with all of finding No. 7, is a conclusion of law.

Turning, now, to the main questions involved: Appellant has assigned 29 errors, which he summarizes as constitutional inquiries as follows: (1) Do the acts complained of constitute a violation of article 8, § 16, of the South Dakota Constitution? (2) Do the acts complained of constitute a violation of the South Dakota Bill of Rights, art. 6, § 3? (3) Do the acts complained of constitute a violation of any provisions of the federal Constitution? (4) Certain subordinate and ancillary questions involved in the foregoing.

The parts of our Constitution to which these inquiries refer read as follows:

Article 8, § 16: "No appropriation of lands, money or other property or credits to aid any sectarian school shall ever be made by the state, or any county or municipality within the state, nor shall the state or any county or municipality within the state accept any grant, conveyance, gift, or bequest of lands, money or other property to be used for sectarian purposes, and no sectarian instruction shall be allowed in any school or institution aided or supported by the state."

Article 6, § 3: "The right to worship God according to the dictates of conscience shall never be infringed. No person shall be denied any civil or political right, privilege or position on account of his religious opinions; but the liberty of conscience hereby secured shall not be so construed as to excuse licentiousness, the invasion of the rights of others, or justify practices inconsistent with the peace or safety of the state. No person shall be compelled to attend or support any ministry or place of worship against his consent nor shall any preference be given by law to any religious establishment or mode of worship. No money or property of the

state shall be given or appropriated for the benefit of any sectarian or religious society or institution."

That part of section 1 of the Fourteenth Amendment to the federal Constitution applicable to this case reads as follows: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty or property without due process of law, nor deny any person within its jurisdiction the equal protection of the laws."

Appellant contends that reading from the King James Bible or repeating the Lord's Prayer as given therein constitutes giving sectarian instruction, in violation of section 16, art. 8, supra. It should be noted that the challenge here is, first, to the entire King James Bible; and, second, to the Lord's Prayer as recorded in that Bible.

Appellant's contention cannot be true unless (a) the King James Bible is a sectarian book; or (b) the Lord's Prayer as therein given is a sectarian prayer.

Before discussing these propositions, it will be necessary to determine the meaning of the word "sectarian," as it is used in section 16, supra, and of the word "sect," from which the former word is derived.

Webster's New International Dictionary defines the word "sect" as follows: "Those attached to a certain opinion or set of opinions, or those following a particular leader or authority; in religion, the believers in a particular creed or upholders of a particular practice; especially, now, a party dissenting from an established church; a religious denomination; a separate religious denomination."

And the word "sectarian" as: "Of or pertaining to a sect or sects; devoted to or promotive of the tenets and interests of a denomination; of, pertaining to, or characteristic of, one devotedly or bigotedly attached to a sect or denomination, as sectarian principles, prejudices, education."

It is manifest, from the slightest inspection of these definitions, that the words "sect" and "sectarian" have not one, but several, meanings. For example, "sect" is said to refer to a body of Christians; a body of persons distinguished by peculiarities of faith and practice. 35 Cyc. p. 1281. It has also been held, in construing

statutes relating to religious liberty, to apply to a political party, and "sectarianism" to adherence to such party, State v. Board of Pres. and Directors, 134 Mo. 296, 35 S. W. 617, 56 Am. St. Rep. 503; and in Vidal v. Girard's Executors, 2 How. 198, 11 L. E. 205, to include infidels, Jews, and Christians; and in People v. Board of Education, 245 Ill. 334, 92 N. E. 251, 29 L. R. A. (N. S.) 442, 19 Ann. Cas. 220, to include free thinkers and atheists. In State v. Dist. Bd., supra, under a Constitution almost identical to our own, the court held the term "sectarian instruction" refers "exclusively to instruction in religious doctrines, and the prohibition is only aimed at such instruction as is sectarian; that is to say, instruction in religious doctrines which are believed by some religious sects and rejected by others. Hence, to teach the existence of a Supreme Being, of infinite wisdom, power, and goodness, and that it is the highest duty of all men to adore, obey and love Him is not sectarian, because all religious sects so believe and teach. The instruction becomes sectarian when it goes further, and inculcates doctrine or dogma concerning which the religious sects are in conflict."

If the word "sectarian" means only of "or pertaining to a sect of sects, peculiar to a sect," as appellant assumes it does, at page 79 of his brief, and the word "sect" includes each separate religious group, as well as atheists and other groups of unbelievers, nothing could be taught in our schools concerning the Catholics of Maryland, the Quakers of Pennsylvania, the Puritans of New England, or any secular or religious society without giving sectarian instruction. In short, no history could be taught without teaching something of the different secular and religious sects and their influence upon government. People v. Stanley, 81 Colo. 276, 255 P. 610, March 28, 1927.

Again, if the word "sect" applies equally to atheists and other groups of unbelievers, and they are protected in their views by our Constitution, as well as Christian sects, as held in State v. Dist. Bd., supra, we would be compelled to exclude from our schools the reading of the Declaration of Independence, the singing of America, and even the reading of section 1, article 21, of our Constitution, because each affirms the existence and supremacy of God. "Such an interpretation would exclude from our schools most of the best literature and leave nothing not sterilized or entirely Godless." People v. Stanley, supra. We have no hesitation in saying:

Such a meaning was never intended by the makers of our Constitution, or the people who voted to adopt it, and appellant's argument based upon that definition of the word "sectarian" must fall.

While there are some decisions to the contrary, we think the phrase "sectarian instruction," as used in section 16, art. 8, of our Constitution, "refers exclusively to instruction in religious doctrines, and the prohibition is only aimed at such instruction as is sectarian; that is to say, instruction in religious doctrines which are believed by some religious sects and rejected by others." State v. Dist. Bd., supra; People v. Stanley, supra; Kaplan v. Independent School Dist., 171 Minn. 142, 214 N. W. 18, 57 A. L. R. 185; Hackett v. School Dist., 120 Ky. 608, 87 S. W. 792, 69 L. R. A. 592, 117 Am. St. Rep. 599, 9 Ann. Cas. 36. The phrase "sectarian school," as used in said section, meant a school organized and existing to promulgate the doctrines of some particular sect. Synod of Dakota v. State, 2 S. D. 366, 50 N. W. 632, 14 L. R. A. 418.

With the words "sect" and "sectarian" thus limited and defined, we proceed to inquire: Is the King James Bible a "sectarian" book? We think the weight of authority, both at the time our Constitution was adopted and since, is that it is not. Vidal v. Girard College, supra; Donahoe v. Richards, supra; Hackett v. Brooksville School, 120 Ky. 610, 87 S. W. 792, 69 L. R. A. 592, 117 Am. St. Rep. 599, 9 Ann. Cas. 36; Church v. Bullock, 104 Tex. 1, 109 S. W. 115, 16 L. R. A. (N. S.) 860; Board of Education v. Minor, 23 Ohio St. 211, 13 Am. Rep. 233; State v. Scheve, 65 Neb. 853, 91 N. W. 846, 59 L. R. A. 927, on rehearing 65 Neb. at page 877, 93 N. W. 169, 59 L. R. A. 927; Spiller v. Woburn, 12 Allen (Mass.) 127; Pfeiffer v. Board of Education, 118 Mich. 560, 77 N. W. 250, 42 L. R. A. 536; Billard v. Board of Education, 69 Kan. 53, 76 P. 422, 66 L. R. A. 166, 105 Am. St. Rep. 148, 2 Ann. Cas. 521; People v. Stanley, supra; Kaplan v. Independent School Dist., supra. And see Evans v. Selma Union High School, 193 Cal. 54, 222 P. 801, 31 A. L. R. 1121, where it is held the Bible is not excluded from school libraries by a statute excluding all sectarian and denominational books.

As opposing this view appellant has cited the following cases: (1) Synod v. State, 2 S. D. 366, 50 N. W. 632, 14 L. R. A. 418; (2) State v. Hallock, 16 Nev. 375; (3) Knowlton v. Baumhover, 182 Iowa, 691, 166 N. W. 202, 5 A. L. R. 841; (4) Freeman v.

Scheve, 65 Neb. 853, 91 N. W. 846, 93 N. W. 169, 59 L. R. A. 927; (5) O'Connor v. Hendrick, 184 N. Y. 421, 77 N. E. 612, 7 L. R. A. (N. S.) 402, 6 Ann. Cas. 432; (6) Herold v. Parish Board, 136 La. 1034, 68 So. 116, Ann. Cas. 1916A, 806, L. R. A. 1915D, 941; (7) People ex rel v. Board of Education, 245 Ill. 334, 92 N. E. 251, 29 L. R. A. (N. S.) 442, 19 Ann. Cas. 220; (8) State v. Dist. Bd., supra, all of which were decided after our Constitution was adopted, and could not have been in the mind of either the convention or the people when that instrument was voted upon. It should be observed that the constitutional provisions contained in our section 16, art. 8, are substantially identical with like provisions in each of the above states, and also with similar provisions in the states of Colorado and Minnesota, later referred to herein.

As the above eight cases, and more particularly cases 7 and 8, are quoted from and largely relied upon by appellant, we will consider them further. Referring to them by the numbers above given, they hold substantially as follows:

Cases (1) and (2) relate solely to sectarian schools, and I think sustain my views heretofore expressed concerning Synod v. State, supra. Cases (3) and (4) hold repeating the Lord's Prayer as given in the King James Bible and reading selected passages from that Bible without comment do not violate such constitutional provisions.

Case (5) holds wearing the distinctive costume of a religious society of the Roman Catholic Church, known as the Sisterhood of St. Joseph, is a sectarian influence, if not the teaching of a denominational doctrine, and was therefore properly prohibited.

Case (6) held reading from the King James Bible and repeating the Lord's Prayer, as given in that Bible, did not violate any rights of the Catholic plaintiff in that case, but reading that part of the New Testament which affirms that Christ was the Messiah and that the Messiah had come violated the rights of the Jewish plaintiff.

Cases (7) and (8) held permission to a teacher to read passages from the Bible must be held permission to read the entire Bible. Based on this premise, the Wisconsin court held in case (8) that, as there were sects, and some parts of the Bible might reasonably be presumed to support the doctrines of the sect claiming to

be founded upon it, the entire Bible should be excluded as a sectarian book. Based on the same premise, the Illinois court held "perhaps" it would be impossible to lay down a test "whereby to determine whether any particular part of the Bible formed the basis of or supported a sectarian doctrine. Such a test seems impracticable. The only means of preventing sectarian instruction in the school is to exclude altogether religious instruction, by means of reading the Bible or otherwise."

It will thus be seen that only one of the eight cases cited by appellant, namely case (8), held the Bible to be a sectarian book and in this case the court said:

"It should be observed in this connection that the above views do not, as counsel seem to think they may, banish from the district schools such text-books as are founded upon the fundamental teachings of the Bible, or which contain extracts therefrom. Such teachings and extracts pervade and ornament our secular literature, and are important elements in its value and usefulness. Such text-books are in the schools for secular instruction and rightly so, and the constitutional prohibition of sectarian instruction does not include them, even though they may contain certain passages from which some inferences of sectarian doctrine might possibly be drawn.

"Furthermore, there is much in the Bible which cannot justly be characterized as sectarian. There can be no valid objection to the use of such matter in the secular instruction of the pupils. Much of it has great historical and literary value which may be thus utilized without violating the constitutional prohibition. It may also be used to inculcate good morals—that is, our duties to each other—which may and ought to be inculcated by the district schools. No more complete code of morals exists than is contained in the New Testament, which reaffirms and emphasizes the moral obligations laid down in the Ten Commandments. Concerning the fundamental principles of moral ethics, the religious sects do not disagree."

If the court takes judicial notice of the contents of the Bible, its sects, and their doctrines, it must also take judicial notice that much of each version is identical, that much of each version of the Bible is not sectarian, and many of the supposed differences raise no sectarian question. It seems clear to me that, if extracts from

the Bible found in secular books may be read without violating the Constitution, the same extracts may be read from the Bible itself without violating the Constitution, and this must be true to the same extent, even though such extracts contain passages "from which some inferences of sectarian doctrine might possibly be drawn." It is difficult for me to see, if "there is much in the Bible which cannot justly be characterized as sectarian," why such parts of the Bible may not be used to inculcate good morals.

Case No. 7 will be hereafter referred to as the Illinois case, and case No. 8 as the Wisconsin case. In the Illinois case the court holds: "The only means of preventing sectarian instruction * * * is to exclude altogether religious instruction." But our Constitution does not exclude religious instruction from the schools, and it is the Constitution and not the courts which excludes. What the Constitution does not exclude, the courts cannot exclude. People v. Stanley, supra; Freeman v. Scheve, supra. In other words, to make the Illinois case an authority here, we must insert the word "religious" in the place of the word "sectarian" in section 16, supra. These words, however, are not synonymous. State v. Frazier, 102 Wash. 369, 173 P. 35, L. R. A. 1918F, 1056; 2 Schofield, Constitutional Law and Equity, 497; Oxford Dictionary; Webster's New International Dictionary.

To make the Wisconsin case an authority for excluding the Bible under the provisions of section 16, art. 8, we must substitute the word "Bible" for the word "sectarian" in that article. This the Constitution makers did not do, and these substitutions we are not now authorized to make. There is no authority which holds there is not much in the Bible that is not sectarian; how, then, can we say it is all sectarian, when we know much of it is not? "Even an atheist could find nothing sectarian in the Book of Esther." People v. Stanley, supra. In this connection it should be observed that both the King James and the Douay Bibles are a compilation of many books written at different times. The original manuscripts from which they were written have all been lost for many hundred years. Each Bible mentioned is a translation of translations. The Douay Bible contains six books, called the Apocrypha, which the King James Bible does not contain. People v. Board of Ed., supra.]

The Bible antedates all sects founded upon it. It did not make them. It cannot be made sectarian, because some partial fol-

lower of some sect interprets it as sustaining his doctrines. It does not become sectarian because some sect translated or adopted it. It is not made sectarian because it is proscribed by the Roman Catholic or any other church; proscription cannot make that sectarian which is not actually so. If it could thus be made sectarian, atheists could proscribe the Star-Spangled Banner, Calvinists Whittier, and the Fundamentalists half of modern science. [ People v. Stanley, supra; Kaplan v. Independent School Dist., supra; Hackett v. Brooksville Sch. Dist., supra.·

Appellant does not contend that the Lord's Prayer is a sectarian prayer, is giving sectarian instruction, or that any sectarian doctrine is based upon it. Therefore it will not be further discussed, until we consider article 6, § 3, of our Constitution.

Two important rules of constitutional construction should be considered here. In construing a doubtful provision of a Constitution:

"The court should look to the history of the times, and examine the state of things existing when the Constitution was framed and adopted, with a view to ascertaining its objects and purposes." 12 C. J. p. 710, § 63.

"The fundamental purpose in construing a constitutional provision is to ascertain and give effect to the intent of the framers and of the people who adopted it." 12 C. J. p. 700, § 43.

Did the framers of our Constitution and the people intend, by using the word "sectarian," or by any other constitutional provision, to exclude the Bible from the schools of our state? We think the history of that document clearly shows they did not. When the Constitution was first adopted and later approved by the people in November, 1885, the statutes of the territory provided: "The Bible shall not be excluded from any public school, nor deemed a sectarian book. It may be read in school without sectarian comment." Section 91, c. 44, Laws 1883.

This remained the law of the territory until the adoption of section 19, c. 47, Laws of 1887, when it was provided: "No sectarian doctrine shall be taught in any public school; but the Bible may be read in school not to exceed ten minutes daily, without sectarian comment; and no pupil shall be required to read it contrary to the wishes of his parent or guardian, or other person having him in charge."

Congress did not admit South Dakota as a state under the Constitution adopted in 1885, but provided, by the Enabling Act passed February 22, 1889, that the Constitution adopted in 1885 should be resubmitted to the people at the election held in May, 1889, for delegates to the constitutional convention. At this election the voters again approved the Constitution of 1885 by a large majority. Thereafter the same Constitution, with certain amendments not material to be noticed here, was adopted by the convention of 1889, and ratified by the people at an election held in October of that year.

The provisions relating to religious liberty in the Constitution of 1885 have remained unchanged to the present time. The law relating to Bible reading in schools remained as enacted in 1887, until it was re-enacted in substantially the same form by subchapter 9, § 18, of chapter 56, Laws 1891. This remained the law until section 6, subc. 6, c. 78, Laws 1893, provided: "Moral instruction, intending to impress upon the minds of the pupils the importance of truthfulness, temperance, purity, public spirit, patriotism, and respect for honest labor, obedience to parents, and due deference for old age, shall be given by every teacher in the public service of the state."

This law was re-enacted by section 6, subc. 6, c. 57, Laws 1897, and has since remained the law of the state. By section 203, c. 135, Laws 1907, it was provided: "No sectarian doctrine may be taught or inculcated in any of the schools of the corporation, but the Bible, without sectarian comment, may be read therein."

This provision has also remained the law of the state, without amendment since that time, and has been, in substance, the law of the territory and state for nearly 31 years; while the statute requiring moral instruction to be given by every teacher "in the public schools of the state" in eight specified subjects, each one of which is pre-eminently taught in the Bible, has been in force and unamended for 35 years and is still the law of the state.

"Cotemporaneous construction by the Legislature is frequently of controlling influence in determining the meaning of ambiguous provisions of a Constitution." 12 C. J. p. 712, § 65. "Legislative construction, long acquiesced in, will not be overthrown by the courts, except on weighty considerations." 12 C. J. p. 813, § 258. We see no such weighty considerations in this case. We therefore

hold that the King James version of the Bible is not a sectarian book, and the Lord's Prayer as found therein is not a sectarian prayer.

It follows that to allege and prove that the Lord's Prayer has been repeated, or selected passages from such Bible have been read in school, does not show a violation of any of the provisions of section 16, art. 8, of our Constitution, unless it is further shown that the selections read give sectarian instruction. When portions are read which are claimed to be sectarian, the courts will consider them. People v. Stanley, supra; 2 Sch. Constitutional L. and E. 476, note 481.

Turning now to article 6, § 3, and referring again to the Lord's Prayer, appellant contends: (a) It is not a correct translation. (b) The so-called doxology is an interpolation. (c) Repeating the Lord's Prayer constitutes worship. Objections (a) and (b) will be discussed together.

Under (a): The Douay version, as given in Matthew 6:11, reads, 'Give us this day our supersubstantial bread;" while the King James Bible, Matthew 6:11, reads, "Give us this day our daily bread." Webster defines the word "supersubstantial" as "beyond the substantial, spiritual," while the word translated "daily" in the King James version might refer to either temporal or spiritual bread. But it should be noted that there are two versions of the Lord's Prayer given in each version of the Bible, one in the Gospel of Matthew, chapter 6, and eleventh verse, and one in the Gospel of Luke, chapter 11, verses 2, 3 and 4. In verse 3, chapter 11, Lake's Gospel, the Douay version translates the Lord's Prayer, "Give us this day our daily bread," identically as it is translated in the King James Bible, Matthew 6:11. Moreover, the doxology to the prayer is omitted in Luke 6, verses 2, 3 and 4, in both versions. To have repeated the prayer as given in either version, or either gospel, would have fully complied with the order of the Faith school board.

Moreover, under (b), appellant contends the words, "For thine is the kingdom, the power, and the glory forever. Amen;" were interpolated into the Gospel of Matthew in the sixteenth century, and are not found in the Douay version or in some Protestant Bibles. Aside from the above-mentioned differences, the prayer is identical in both versions.

Under objection (b) : Appellant says at page 19 of his abstract: "It is conceded that to the devotional thought thereby expressed no Catholic entertains any objection. On the other hand, however, the addition of such words to the Lord's Prayer, if not warranted by the words of Christ according to the correct translation of the Gospels, is to some extent a test of the accuracy and authenticity of the respective versions. For that reason it might justly be objected to by the Catholic Church, which insists that such words are an interpolation."

It is manifest that these objections may be obviated by repeating the prayer as given in Luke, and at most they raise only questions of accuracy, correct translation, and authenticity. Such questions are not judicial. Courts are not concerned with which Bible gives the correct translation, with the truth of the doctrines taught, or whether certain words were or were not interpolated. Herold v. Parish Board, 136 La. 1034, 68 So. 116, Ann. Cas. 1916A, 806, L. R. A. 1915D, 941 ; People v. Stanley, supra.

Under (c) : It is contended reading the Bible and repeating the Lord's Prayer is worship. The Constitution does not prohibit any person from worshipping at any time or place. It does prohibit compelling any person "to attend or support any ministry or place of worship against his consent." Const. art. 6, § 3. Therefore the constitutional question presented is : Does reading the Bible and repeating the Lord's Prayer, as herein shown, make the teacher a minister or the school house a place of worship? The former is not claimed. Concerning the latter, the records of our three constitutional conventions show that each day's session of each convention was opened with prayer, usually offered by a priest or minister of some denomination.

Each day's session of our Legislature held at the state house in Pierre, and each day's session of the Congress held at the Capitol in Washington is also opened with prayer, usually by a priest or minister of some denomination, and this has been the almost universal custom concerning legislative bodies and important conventions from the founding of our government to the present time. "No principle of constitutional law is violated * * * when legislative sessions are opened with prayer or the reading of the scriptures." Cooley's Const. Limitations, vol. 2, p. 975. If reading the Bible and offering prayer does not constitute other public buildings,

maintained by taxes paid by the people, places of worship, we are unable to see how the like exercises can make a schoolhouse a place of worship. People v. Stanley, supra; Kaplan v. Independent School Dist., supra.

Appellant next contends that making compulsory the reading of the Bible in the public schools, though without comment, under penalty of expulsion, if the children do not attend, violates the following provisions of article 6, § 3: (1) "The right to worship God according to the dictates of conscience shall never be infringed." (2) "No person shall be denied any civil or political right, privilege or position on account of his religious opinions." (3) "No person shall be compelled to attend or support any ministry or place of worship against his consent." (4) "Nor shall any preference be given by law to any religious establishment or mode of worship."

Under 1: We think it may be assumed that no child attended the Faith school for the purpose of worship. He was not therefore prevented from worshipping. The record here shows that no child was required or even permitted to take any part in reading the Bible or repeating the Lord's Prayer. Whichever of these acts was done was done by the teacher alone. No posture or gesture of worship was required of either pupil or teacher during these exercises. All that was required of any pupil was to sit at respectful attention for a period of about three minutes each day while the teacher read or repeated from the Bible. Such an attitude the teacher was entitled to expect, and the pupil to observe, toward all instruction given by the teacher during school hours.

Appellant's argument seems to be based upon the proposition that the Bible can never be read in a schoolroom for its historical, literary, or moral value alone; that when it is read there, or the Lord's Prayer repeated there, it necessarily becomes worship, and each individual a worshipper. With this contention we cannot agree. Moral truth, literary gems, and historical facts should be, and we think may be, presented in school for what they are, regardless of the place from whence they came. State v. Scheve, supra; People v. Stanley, supra; Kaplan v. Independent School Dist., supra. If what is read does not violate the Constitution, neither the covers nor the title of the book from which it is read can make it unconstitutional.

In the Illinois case, No. 7, supra, the pupils were required to stand, fold the hands, and bow the head during the morning exercises, and in that attitude repeat the Lord's Prayer in concert, and of this exercise the Illinois court said: "The wrong arises, not out of the particular version of the Bible or form of prayer used— whether that found in the Douay or the King James version—or the particular songs sung, but out of the compulsion to join in any form of worship. The free enjoyment of religious worship includes the freedom not to worship."

In Herold v. Parish Board, No. 6, supra, the Louisiana court said: "We cannot conclude that plaintiff Marston or his children would have their consciences violated by the reading of the Bible, or of the offering of the Lord's Prayer, which prayer is contained in all versions or translations of the New Testament." 136 La. 1042, 68 So. 119.

Where, as in this case, nothing sectarian is taught, and nothing to offend the devotional sense is said in such opening exercises, and the pupil takes no part either by word or act therein, we are unable to see how appellant's right to worship God is in any way infringed.

(2) For the same reasons we must also hold that no civil or political right, privilege, or position has been denied to appellant by these exercises. Nor has any preference been given by law to any establishment or mode of worship.

We have already discussed objection No. 3, and found it was not well founded. When the court takes judicial notice of the contents of the Bible, the different sects, and the doctrines each maintains, it must also take judicial notice that many passages in each of these Bibles are identical; that like the Lord's Prayer much more of it is only slightly different in translation, and involves no sectarian or other judicial question; in other words, that "there is much in the Bible which cannot justly be characterized as sectarian. There can be no valid objection to the use of such matter in the secular instruction of the pupils." State v. Dist. Bd., supra.

We should further note that these Bibles are both Bibles of the Christians. Herold v. Parish Board, supra. Being Christian Bibles, translated from the same manuscripts, how can reading non-sectarian parts of identical translations, or even faulty translations,

not objectionable to any devotional thought, from either Bible, be held to infringe any one's right to worship?

Appellant lays great stress upon the following findings of fact, requested by him, and found by the court:

No. 7: "That defendants ordered the Bible read and the Lord's Prayer repeated for the purpose of increasing, improving, and inculcating morality, patriotism and reverence, and for the purpose of developing religious and Christian characters of the pupils of said school."

No. 8: "That it is contrary to and in violation of the faith, doctrines, teachings, and dogmas of the Roman Catholic Church and religion, for any Catholic to read or listen to the reading of the King James version or translation of the Bible, or the repeating of the Lord's Prayer unless the Catholic version thereof be used."

No. 9: "That said Marvin Finger and the said August Finger believe that it is religiously wrong and contrary to the teachings, doctrines, and discipline of the Roman Catholic Church, to which they belong, to listen to the reading of the said King James version of the Bible, or the repeating of the Protestant version of the Lord's Prayer, and said Marvin Finger and August Finger entertained such belief at the time the said Marvin Finger absented himself from the schoolroom on account of the reading of said King James version of the Bible and the repeating of the Lord's Prayer."

This record shows that this trial was closed, that seven findings of fact and four conclusions of law were made by the court, and judgment entered thereon denying the writ prayed for on July 24, 1925. It does not appear that the case was held open, or reopened, or that any further evidence was offered, or anything further done in the case, until September 22, 1925, when, without stipulation or notice, so far as the record shows, on the application of plaintiff, 9 additional findings of fact were made. The substance of the seventh, eighth, and ninth of these findings is given above. If finding of fact, so made without stipulation, notice or reopening the case, long after judgment was rendered, have any place in this record (a question we do not now determine), they must be based upon the evidence given during the original trial.

There is no evidence in the record showing what the purpose of the board was in ordering the Bible reading, and certainly no

evidence showing or tending to show that it was done with the purpose of developing the "religious and Christian characters" of the pupils. If we are justified in assuming the purpose of the board, we think we should assume that it was for the purpose of giving the "moral instruction" in truthfulness, temperance, purity, public spirit, patriotism, respect for honest labor, obedience to parents, and due deference to old age, which section 7631, Rev. Code 1919, provides should be given by every teacher in the public service of the state.

But, if the purpose of such instruction was to develop religious and Chrsitian character, can we say it was unconstitutional? The word "religious" has no definite or well-defined meaning in law. It is said to be "based on a belief in an accountability to God, a Supreme Being." Kaplan v. Independent School Dist., supra. The preamble to our Constitution says: "We, the people of South Dakota, grateful to Almighty God for our civil and religious liberties, in order to form a more perfect and independent government," etc. It says in Const. art. 21, § 1, that the seal of South Dakota shall contain the words: "Under God the people rule."

It cannot be unconstitutional to teach what the Constitution itself affirms. I approve of what was said in State v. Dist. Bd., supra, where the court says: "To teach the existence of a Supreme Being of infinite wisdom, power, and goodness, and that it is the highest duty of all men to adore, obey, and love Him, is not sectarian, because all religious sects so believe and teach."

Nor do we think it would violate any provision of our Constitution to teach the Golden Rule, or the moral precepts laid down in the Ten Commandments, or in the New Testament. Referring to finding No. 8, that it is contrary to and in violation of the faith, doctrines, teachings, and dogmas of the Roman Catholic Church and religion for any Catholic to read or listen to the reading of the King James translation of the Bible, as to this finding August Finger testified: "Am acquainted with the rule of the Catholic Church as to the reading of versions of the Bible not approved by the Bishops. Am acquainted with King James version of the Bible, and know that Catholics are not authorized to read that version." The only other evidence touching this point is found in the following stipulation: "That the Douay version of the Bible is the only Bible authorized by the Catholic Church." No doctrine or

dogma of the Catholic Church is shown, or pointed out, which sustains this finding, and manifestly it is not sustained by this evidence.

It is true that there was a loose leaf under the cover of part I of appellant's brief purporting to have been taken from the Great Encyclical Letter of Pope Leo XIII, purporting to prohibit Bible reading in the vernacular. But this letter was neither offered nor received in evidence, and is not before this court. Furthermore Pope Benedict XV, answering an address of the St. Jerome Society formed for the purpose of translating and disseminating the New Testament in the vernacular of Italy, said: "They are doing a work of supreme advantage for the forming for Christian perfection of the minds of those who, * * * are waiting eagerly for the diffusion of the Divine Gospels. * * * We ardently desire * * * that the sacred books enter into the bosom of Christian families, * * * so that the faithful may accustom themselves to read the Holy Gospels and comment on them every day, learning thus to live holily."

Finding No. 9 was to the effect that appellants believed it was religiously wrong, and contrary to the teachings, doctrines and discipline of the Roman Catholic Church, to read or listen to the reading of the King James Bible or repeating the Lord's Prayer as given in that Bible. If the phrase "religiously wrong" means any more than not authorized by the teachings and doctrines of the church, it is not made apparent.

The court does not find that appellants believed it would be wrong to read or listen to reading from the King James Bible, but only "religiously wrong," and as suggested we think this means not authorized by the teachings and doctrines of the church. As so considered, it means practically no more than finding No. 8, and is not sustained by the evidence.

If any church, by prohibiting a book, could prevent its use in school, this would usurp the power of the school board to determine what should be taught in the schools. I hold that reading selected passages from the Bible and repeating the Lord's Prayer from the King James version without comment does not violate any of the provisions of article 6, § 3, of our Constitution.

Section 1, art. 8, of our Constitution provides as follows: "The stability of a republican form of government depending on the

morality and intelligence of the people, it shall be the duty of the Legislature to establish and maintain a general and uniform system of public schools wherein tuition shall be without charge, and equally open to all; and to adopt all suitable means to secure to the people the advantages and opportunities of education." This section is a mandate to the Legislature to provide a system of schools wherein education in "morality and intelligence" shall be given to all. 2 C. J. p. 740, § 145, and page 741, § 152; In re State Bonds, 7 S. D. 42, 63 N. W. 223; State v. Kansas City, 233 Mo. 162, 134 S. W. 1007, at page 1011 of opinion.

Pursuant to this mandate the Legislature empowered school boards in independent districts (to which class Faith independent school district belongs) to maintain a unifrom system of instruction, and to provide a course of study from the ninth to the twelfth grades, inclusive (section 7547, subsecs. 4, 5, Rev. Code 1919), and empowered the board to supply text, reference, and library books for the use of the school (subsection 9). The Legislature also provided what subjects might be taught and designated the textbooks to be used. Sections 7637-7640, Rev. Code 1919. The board was further empowered to exercise control over the schools and school corporation. Section 7546, subsec. 1.

Under this authority the school board had power to add physical culture, athletics, and the cultivation of vocal talent to the course of instruction; also to require pupils to furnish a physical report from an examining physician as a condition of admission to the public schools. Streich v. Board of Education, 34 S. D. 169, 147 N. W. 779, L. R. A. 1915A, 632, Ann. Cas. 1917A, 760. Pursuant to this legislative authority the Faith board ordered selected passages from the Bible to be read without comment or the Lord's Prayer repeated in each room of the Faith school, and for the purpose of preventing disorder and to prevent interference with the studies and rights of other pupils in the school declined to excuse any pupils from such exercises. From the record before us, we cannot say that the board acted arbitrarily or abused its discretion in any of these exercises, and we hold it did not.

Article 6, § 3, also provided three limitations upon the religious liberty granted by that section, as follows: (1) Such liberty should not "excuse licentiousness"; (2) invade "the rights of

others"; or (3) "justify practices inconsistent with the peace or safety of the state."

Construing section 3 with these limitations, it is plain that the religious liberty secured thereby ceased when it disturbed the school and invaded the rights of the other pupils, or became inconsistent with the peace or safety of the state. In other words, religious liberty is never infringed when it is stopped at the point where it becomes licentious, an invasion of the rights of others, or inconsistent with the peace or safety of the state.

If morality is to be taught in the schools, it must be taught from something, and, so far as this record discloses, no other textbook was designated for this purpose. Practically all the authorities cited herein, from Vidal v. Girard's Executors down to the last case, affirm the fitness of the Bible for such moral instruction.

The two remaining questions will be discussed together:

(1) Did the exercises in the Faith school violate the provisions of Amendment 14, § 1, of the federal Constitution which provides: "No state shall * * * deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

(2) Was such right violated by denying appellant's application to permit the children to withdraw during the reading of the scriptures?

We adopt the following portion of what was said in People v. Stanley, supra, as follows: "(1) The state, for its own protection, may require all children to be educated. This needs no citation. (2) Certain studies plainly essential to good citizenship must be taught. Pierce v. Society of Sisters, 268 U. S. 534, 45 S. Ct. 571, 69 L. Ed. 1070, 39 A. L. R. 468; Meyer v. Nebraska, 262 U. S. 390, 43 S. Ct. 625, 67 L. Ed. 1042, 29 A. L. R. 1446. And, as a corollary, such studies may be required of every child."

It is the contention of the appellant that his right to bring up his child to worship God according to the dictates of his own conscience has been violated. If we are correct in what we have said thus far, that right has not been violated, for the reason that no sectarian doctrine was taught in the Faith school. The child was not required to worship, or prevented from worshipping, his devotional thought was not offended, and no right of his or his parents was infringed.

Appellant is seeking here to exclude from the school a book which contains useful knowledge, which is not immoral, which is not injurious to the child. "It is hard to see how the gift of a book which the court says is good, and which is good without a court decree, can be said to deprive a person of life, liberty, or property without due process" of law "under the 14th Amendment." Minority opinion in People v. Stanley, supra.

In Jones v. City of Portland, 245 U. S. 217, 38 S. Ct. 112, 62 L. Ed. 252, L. R. A. 1918C, 765, Ann. Cas. 1918E, 660, the Supreme Court of the United States said: "Bearing in mind that it is not the function of this court under the authority of the Fourteenth Amendment to supervise the legislation of the states in the exercise of the police power beyond protecting against exertions of such authority in the enactment and enforcement of laws of an arbitrary character, having no reasonable relation to the execution of lawful purposes."

We think it cannot be said that the action of the Faith school board was arbitrary, or that the reading of the Bible "had no reasonable relation to the execution of a lawful purpose"; i. e., the teaching of morality. "The liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly free from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members. Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others. Jacobson v. Massachusetts, 197 U. S. 11, 25 S. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765; Smith v. Texas, 233 U. S. 630, 34 S. Ct. 681, 58 L. Ed. 1129, L. R. A. 1915D, 677; Patterson v. Colorado, 205 U. S. 454, 27 S. Ct. 556, 51 L. Ed. 879, 10 Ann. Cas. 689; Williams v. Fears, 179 U. S. 270, 21 S. Ct. 128, 45 L. Ed. 186; Otis v. Parker, 187 U. S. 606, 23 S. Ct. 168, 47 L. Ed. 323; Patterson v. Eudora, 190 U. S. 169, 23 S. Ct. 821, 47 L. Ed. 1002; Aikens v. Wisconsin, 195 U. S. 104, 25 S. Ct. 3, 49 L. Ed. 154;

Smiley v. Kansas, 196 U. S. 447, 25 S. Ct. 289, 49 L. Ed. 546;
McLean v. Arkansas, 211 U. S. 539, 29 S. Ct. 206, 53 L. Ed. 315;
Grenada Lbr. Co. v. Mississippi, 217 U. S. 433, 30 S. Ct. 535, 54
L. Ed. 826; House v. Mayes, 219 U. S. 270, 31 S. Ct. 234, 55
L. Ed. 213."

In Curtis & Brandegee's American Constitution, pp. 673, 674,
it is said: "Rights of necessity being a part of the law · * * * are
subject to such reasonable conditions as may be decreed by the
governing authority essential to the safety, health, peace, good order
and morals of the community." Compagnie Francaise v. Louisiana
State Board of Health, 186 U. S. 393, 22 S. Ct. 811, 46 L. Ed.
1209; Bowditch v. Boston, 101 U. S. 16, 25 L. Ed. 980; Meyer v.
Nebraska, 262 U. S. 390, 43 S. Ct. 625, 67 L. Ed. 1042, 29 A. L.
R. 1446.

In the last case the court said: "No emergency has arisen
which renders knowledge by a child of some language other than
English so clearly harmful as to justify its inhibition. * * * Ex-
perience shows that this [proficiency in foreign languages] is not
injurious to the health, morals or understanding of the ordinary
child."

It is a matter of common knowledge that the educated crimi-
nal is the most dangerous of criminals; that morality and moral
training are necessary to the existence of the state, and where the
education, as in this case, has a "reasonable relation to some pur-
pose within the competency of the state" (Pierce v. Society of
Sisters, supra), the state has the right to exact such education from
all children.

Finding no error in the record, the judgment and order ap-
pealed from should be affirmed.

BROWN, J. I dissent. The only question in this case is
whether or not the reading of any part of the Bible by a teacher in
a public school in this state during the sessions of the school and
in the presence of the pupils is in violation of the Constitution of
the state. In the affidavit for the writ of mandamus applied for,
it is said that affiant refuses to have his son agree "to attend upon
any public school or place of instruction where he is obliged to
listen to the reading of any part of the Bible." The moving affida-
vit does not so much as mention the Lord's Prayer. Reading of

the Bible alone is made the subject of complaint; the Lord's Prayer is not in issue, except as it may be a part of the so-called "King James version" of the Bible.

Concerning the difference between the Catholic and Protestant forms of the Lord's Prayer appellant testified: "The only difference that I know of is in the words 'For Thine is the kingdom, and the power and the glory, forever. Amen.' That is the only difference that I know." But there are two versions of the Lord's Prayer in the King James version of the Bible, one in Matthew 6, 9-13, and the other in Luke 11, 2-4, and in Luke's version, the sentence, "For Thine is the kingdom, and the power, and the glory, forever. Amen," is not to be found. There are likewise two versions in the Douay Bible, found in the same chapters and verses of the same Gospels, in one of which the phrase "supersubstantial bread" occurs, which gives rise to serious argument on the part of appellant's counsel, who contend that this is widely different in meaning from the rendering in the King James version, where the term is "daily bread." The Author of the prayer Himself does not seem to have recognized any difference, because in the Douay version of the Bible, the only version recognized by the Catholic Church, in Matthew He uses the term "supersubstantial bread," and in Luke He uses the term "daily bread." It would seem, therefore, that He used the terms interchangeably, and that the claimed distinction over which counsel for appellant wrangle in such deadly earnest is, in reality, a distinction without a difference. In reality, can there be any difference? Does not bread, when used in a petition to God, include the Bread of Life, which is Christ Himself, the Supersubstantial Bread? To do appellant justice, he himself did not deem the difference here to be important enough to mention it in his testimony. It remained for his counsel in the argument to seize upon this phrase, and magnify it into a matter of vital importance for their contention on the appeal.

As we have said, neither in the moving papers nor in the answer, nor in any evidence offered on the trial, is there the slightest intimation of what was read from the Bible. The answer says that either a passage from the Bible was read or the Lord's Prayer was repeated. That, and nothing more, is the record before this court as to what was done, which is alleged to be in violation of the Constitution of the state. No word or sentence is specified or men-

tioned which is claimed to be a stumbling stone or rock of offense to either appellant or his son. Appellant simply refuses to let his son attend any school where *any part* of the King James version of the Bible is read. The only question before us is, therefore, this: Does the reading of any part of the so-called King James version of the Bible by a teacher in a public school in South Dakota, as a part of the school program or exercises, violate any of the provisions of the state Constitution?

The only provisions of the Constitution brought to our attention, which are said to be or can be transgressed by reading any part of the Bible, are contained in article 6, § 3, and article 8, § 16, which read as follows:

Article 6, § 3:

(a) "The right to worship God according to the dictates of conscience shall never be infringed."

(b) "No person shall be denied any civil or political right, privilege or position on account of his religious opinions."

(c) "No person shall be compelled to attend or support any ministry or place of worship against his consent, nor shall any preference be given by law to any religious establishment or mode of worship."

(d) "No money or property of the State shall be given or appropriated for the benefit of any sectarian or religious society or institution."

Appellant disavows any reliance on paragraph (d).

Article 8, § 16:

(a) "No appropriation * * * to aid any sectarian school shall ever be made," etc.; nor

(b) "Shall the state or any county or municipality * * * accept any gift or grant to be used for sectarian purposes;" and

(c) "No sectarian instruction shall be allowed in any school or institution aided or supported by the state."

It is a fundamental rule of statutory construction that words must be held to have been used by the Legislature in their popular and generally accepted sense. Sutherland on Statutory Construction, pp. 246-248; Maxwell on Interpretation of Statutes, p. 88; State v. One Pontiac Coach Automobile (S. D.) 224 N. W. 176. The same rule is applicable in construing the language of constitutions. "In the main, the general principles governing the construc-

tion of statutes apply also to the construing of constitutions." 12 C. J. 699; Davenport v. Elrod, 20 S. D. 567, 107 N. W. 883; State v. Boyden, 21 S. D. 6, 108 N. W. 897, 15 Ann. Cas. 1122. "The fundamental purpose in construing a constitutional provision is to ascertain and give effect to the intent of the framers and of the people who adopted it." 12 C. J. 700.

In incorporating the above-quoted provisions in our Constitution, what was the intent of the framers of the Constitution and of the people who adopted it? It may be observed that our Constitution was adopted before any of the decisions relied upon in the opinion of the majority were pronounced; therefore those decisions can give but little help in determining what was the intention of the framers of our Constitution, or of the people who adopted it, in using the language of the provisions quoted. Decisions which had been published before the framing of the Constitution, and which were presumably known to its framers, may throw some light on their intent. Likewise the actual practice of those engaged in framing the Constitution may be helpful in ascertaining the meaning they attached to the language they used.

Nearly five years prior to the adoption of our Constitution the Supreme Court of the neighboring state of Iowa, in the case of Moore v. Monroe, 64 Iowa, 367, 20 N. W. 475, 52 Am. Rep. 444, had decided that the reading of the Bible in the schools did not contravene provisions of the Constitution of that state substantially similar to our own. Similar decisions had been made by the courts of other states, and we are cited to no decision prior to the adoption of our Constitution holding that provisions like those we have quoted were violated by a statute authorizing the reading of the Bible in the public schools. The convention that framed the Constitution had in its membership some of the ablest lawyers then in South Dakota, among them two who had been judges of the Supreme Court of the territory, and two others who became members of the Supreme Court of the state upon its admission to the Union. It may be presumed they knew of the decision in Moore v. Monroe, supra.

That the reading of the Bible in public schools or other institutions supported by the public was not considered by the framers of our Constitution either to infringe upon the right to worship God according to the dictates of conscience or to constitute a denial

of any political right, privilege, or position, or to transform the building in which it was read into a place or worship, or to be in violation of "the broad ground of religious liberty," or of any other provision of the Constitution, seems apparent from a consideration of the legislation of the territory of Dakota and of the proceedings had in the convention which adopted the Constitution. In Laws Dak. Ter. 1862-63 (2d Sess.) c. 33, § 9, we find the keeper of each prison in the state required to provide *at the expense of the county,* for each prisoner under his charge, a copy of the Bible or New Testament. This section was re-enacted verbatim in the Rev. Codes 1877, as section 635, Code Cr. Proc. It was again re-enacted in the Compiled Laws of 1887 as section 7809. After the adoption of the Constitution it was re-enacted once more as section 741 of the Code of Criminal Procedure in the Revised Codes of 1903, and Rev. Code 1919, § 10195, provides that among the rules that may be adopted by the board of charities and corrections for the government of jails is the supplying of each prisoner with a Bible.

Laws 1883, c. 44, § 91, provided that the Bible shall not be excluded from any public school nor be deemed a sectarian book, and that it might be read in school without sectarian comment not exceeding 10 minutes daily. Laws 1887, c. 47, § 19, reads: "No sectarian doctrine shall be taught in any public school; but the Bible may be read in school not to exceed ten minutes daily, without sectarian comment; and no pupil shall be required to read it contrary to the wishes of his parent or guardian, or other person having him in charge." This was carried verbatim into the Compiled Laws of 1887 as section 1706, and has been substantially re-enacted in all revisions of the Code since the adoption of the Constitution.

An examination of the proceedings of the constitutional convention at the time of the adoption of the Constitution in 1889 reveals that every session at which any business was done was commenced by prayer, and that on approximately one-half of the occasions the prayer was offered by some member of the convention. In view of the trend of judicial decision prior to the adoption of the Constitution, of the legislative history of the territory prior to and of the state since its adoption, and of the practice of the constitutional convention itself during the proceedings resulting in its

adoption, I cannot believe that the framers of the Constitution used the language in the parts of the Constitution hereinbefore quoted with any intention whatever to thereby prohibit the reading of the Bible in the public schools, or in any other public institution of the state, or that they had any thought that any such construction would ever be attempted to be placed on such language.

I do not agree with the majority thesis that readings from the Bible cannot be used as a text-book of morals, that such use of the Bible in school is "necessarily devotional," nor do I believe that the "Bible is hardly adaptable for use in secular instruction without comment and analysis." It should be observed that comment and analysis are *not* forbidden, but only *sectarian* comment. Yet I find much in the Bible that is well adapted for use in secular instruction, without any comment or anlysis whatever. I read in the King James version, "Thou shalt not steal." No comment or analysis is necessary in order to impress the lesson of the sentence upon any person who knows the meaning of the words. Again, "My son, if sinners entice thee, consent thou not." "Happy is the man that findeth wisdom and the man that getteth understanding." Comment or analysis is unnecessary here. "If thou meetest thine enemy's ox or his ass going astray, thou shalt surely bring it back to him again." What comment or analysis is necessary to impress this duty? Is comment or analysis needed to elucidate the counsel of Peter, "Add to your faith virtue, and to virtue, knowledge; and to knowledge, temperance; and to temperance, patience." The story of the prodigal son needs no comment or analysis to make it plainer than it is, nor does the thirteenth chapter of First Corinthians stand in need of comment or analysis to make it valuable for secular instruction.

Appellant's position before this court is that the Constitution of the state forbids any of these portions of Scripture to be read in school in the hearing of the pupils. There is nothing in the record in this case showing that any portion of the Bible was read that stood in need of any comment or analysis. Appellant's son was not required to read, nor was he required to assume any attitude characteristic of devotion while the teacher read. All that was required of him was that he would deport himself during that part of the school program in the same decorous and respectful manner that he ought to during any other part of it.

The majority opinion quotes what it calls an apt passage from appellant's brief, wherein occurs the sentence: "King Lear may be commented upon at will, but the Book of Job, the first great drama, with its thundering passages, must be read unexplained." The aptness is not apparent to me. The quoted passage seems to me as sounding brass or a tinkling cymbal. It is at once deflated by the observation that comment on the Scriptures is not forbidden; it is only *sectarian* comment that is inhibited. I suppose the school board might, if it chose, permit the reading of King Lear and at the same time prohibit propaganda by the teachers to the effect that Bacon was the author of the play.

Appellant's counsel contend that, because different Christian sects wrangle over the significance of particular verses or texts in the Bible, those portions of the Bible must be sectarian, and that, if any part of the Bible is sectarian, the whole must be. They say: "It has been suggested that the reading of the Bible is not sectarian, because it is not certain that passages will be selected to be read which are in any degree objectionable to any sect. In other words, the constitutional validity is made to depend on the fortuitous contingency that the teacher may at all times select passages upon which all sects agree." And they proceed to characterize the suggestion as "mere sophistry." But the right of any one to question the constitutional validity of a statute always depends on the fortuitous contingency that what is done or threatened under the statute affects him injuriously. 12 C. J. 762. If nothing sectarian is read, and no sectarian comment is made, appellant is not affected injuriously, in contravention of any provision of the Constitution. A whole volume is not necessarily objectionable because a few sentences may be selected therefrom that are. Must Portia's homily on the quality of mercy be excluded from the public schools, because the book in which it is bound contains also the soliloquy of Falstaff, at the reading of which in public even the depraved might blush?

Many things are advanced as axioms in the majority opinion that are not self-evident to me. The statement that the Bible "is hardly adaptable for use in secular instruction without comment and analysis" is at variance with the personal experience of an elder generation, many of whom attended schools in childhood where portions of the Bible were selected for reading lessons, and were

read by the pupils without comment or analysis from the teacher. But now we learn that such reading could not well be without comment, that it is necessarily devotional "and would be worse than useless otherwise." Some of us must have come under the curse.

The Supreme Court of Maine is criticized in the majority opinion for placing a decision sustaining the practice of Bible reading in school on the ground that it was claimed to be used as a text-book for reading, and the majority opinion says: "This seems a far-fetched excuse, when it is considered that only such pupils as were able to read it were required to participate in the reading. Text-books for reading are usually used by those who need to acquire the art." I had thought text-books for reading were for those who *had* acquired the art, but desired to attain proficiency in the art, and to learn something of what the text-books were designed to teach. Are swimming pools only for those who cannot swim, who need to acquire the art?

That appropriate passages from the Bible may be used in secular education is supported by no less an authority than Prof. Huxley, who was neither a Catholic nor a Protestant. When in 1870 he was a candidate for a place on the London school board, which had the duty of administering the Education Act of that period, which provided, "No religious catechism or religious formulary which is distinctive of any particular denomination shall be taught in the schools," he said regarding the reading of the Bible in the schools: "Even if the reading of the Bible were not, as I think it is, consonant with political reason and justice, and with a desire to act in the spirit of the education measure, I am disposed to think it might still be well to read that book in the elementary schools. I have always been strongly in favor of secular education, in the sense of education without theology; but I must confess I have been no less seriously perplexed to know by what practical measures the religious feeling, which is the essential basis of conduct, was to be kept up, in the present utterly chaotic state of opinion on these matters, without the use of the Bible. The pagan moralists lack life and color, and even the noble Stoic, Marcus Antonius, is too high and refined to an ordinary child. Take the Bible as a whole; make the severest deductions which fair criticism can dictate for shortcomings and positive errors; eliminate, as a sensible lay teacher would do, if left to himself, all that it is not

desirable for children to occupy themselves with; and there still remains in this old literature a vast residium of moral beauty and grandeur. And then consider the great historical fact that, for three centuries, this book has been woven into the life of all that is best and noblest in English history; that it has become the national epic of Britain, and is as familiar to noble and simple, from John-o'-Groat's House to Land's End, as Dante and Tasso once were to the Italians; that it is written in the noblest and purest English; and abounds in exquisite beauties of mere literary form; and, finally, that it forbids the veriest hind who never left his village to be ignorant of the existence of other countries and other civilizations, and of a great past, stretching back to the farthest limits of the oldest nations of the world. By the study of what other book could children be so much humanized and made to feel that each figure in that vast historical procession fills, like themselves, but a momentary space in the interval between two eternities; and earns the blessings or the curses of all time, according to its efforts to do good and hate evil, even as they also are earning their payment for their work?"

I think that, after the lapse of nearly 60 years, Prof. Huxley's argument is not only sound today, but is even more pertinent to present conditions than to those existing when he made it. And classic American literature no less than English literature is so interwoven with the Bible that those ignorant of that book must in a measure be unable to grasp or appreciate the beauty and nobility of the best literature of their own country.

But the majority say that nothing should be done in the public schools that would develop the religious feeling. They say: "About as far as we can go in that field in the public schools without objection is to teach that there is an All-Wise Creator, to whom we owe love, reverence, and obedience, leaving to the churches other religious instruction." Darrow and his followers do not believe that there is an All-Wise Creator to whom we owe love, reverence, and obedience. Shall that much be permitted in public schools which they are taxed to support, and where their children have a right to go and be educated?

After devoting the main part of the opinion to a discussion of the sectarian element in the Bible, the majority seem to abandon the position that the reading of the Bible is sectarian teaching, and

say: "We do not feel that the question of sectarian teaching is controlling, and do not decide that feature, preferring to put our decision on the broader ground of religious liberty." I cannot find anything in the record that brings up the question of religious liberty. If anything can be far-fetched, it is the contention that the record in this case shows that any one was compelled to worship in a manner contrary to the dictates of his conscience, or that any one was compelled to worship at all, or that religious liberty is in any way denied to any party to the proceeding or to any one else.

While perhaps not very important, in the interest of accuracy it should be pointed out that the quotation ascribed to respondents in the majority opinion, where the burning of the bones of Wycliffe is referred to, is not, properly speaking what respondents *say*, but is what they *quote,* from "a writer in the New Age."

State v. School Board, 76 Wis. 177, 44 N. W. 967, 7 L. R. A. 330, 20 Am St. Rep. 41, is referred to by the majority as a leading case on the subject involved in the controversy. In that case it was said that the views of the court did not "banish from the district schools such text-books as are founded on the fundamental teachings of the Bible, or which contain extracts therefrom. Such teachings and extracts pervade and ornament our secular literature, and are important elements in its value and usefulness." And in the majority opinion in the present case it is said that "in the study of literature, or other subjects, a quotation from the Bible may be useful in the study of the subject, but such quotation is incidental to the subject pursued, and its use is not devotional or religious." In the language of the Psalmist, "Such knowledge is too wonderful for me; it is high, I cannot attain unto it." If the teachings of the Bible are offensive or objectionable when bound in the book called "The Bible," I cannot see how they can be less offensive or objectionable when bound as part of another book. It is the teaching that is important, not the form in which it is bound. I suppose prussic acid swallowed from a golden goblet is just as poisonous as if swallowed from a common glass tumbler.

Webster's Dictionary is full of quotations from the King James version of the Bible. Under the definition of "bread" occurs the quotation from Matthew vi, 11: "Give us this day our daily bread." Suppose a teacher begins to read to his pupils article 6, § 3, the portion of the Bill of Rights around which this contro-

versy rages. As he finishes the sentence, "No person shall be compelled to attend or support any ministry or place of worship against his consent, * * *" a pupil asks, "Does the word 'ministry' mean the same thing as 'place of worship'? Does 'or' signify that what follows is only an alternative expression of the meaning of the word that precedes it?" The teacher, according to the majority opinion, is forbidden by the Constitution to read or comment on any portion of the Bible, but no judicial decision—so far—holds that it is unconstitutional for a teacher to expound the Constitution, so the teacher replies that: " 'Ministry' does not mean the same thing as 'place of worship,' but it means the *act* of w——. No, let me see—it doesn't mean the act of worship. It means—ah, hem,—maybe we had better turn to the dictionary and get the correct definition of what it means." So he opens Webster's and reads: "Ministry—see minister. The act of ministering; ministration." Pursuing the investigation as directed, he seeks "minister." Here he finds the word as a noun defined, among other definitions, as "a subordinate, an agent, an instrument," and illustrated by the following quotation: "Moses rose up, and his minister Joshua; Ex. xxiv, 13." As a verb it is defined: "To act as a servant, attendant or agent; to attend and serve; to perform service in any office sacred or secular. 'The Son of man came not to be *ministered* unto.' Matt. xx, 28." The definition is further illustrated thus, "Angels came and *ministered* unto Him. Matt. iv, 11," and the definition contains the further reference, Matthew xxv, 44, without quotation, which the studious person, adult or child, will naturally refer to, and here he comes upon a whole verse: "Then shall they also answer Him, saying, Lord, when saw we Thee an hungered or athirst, or a stranger, or naked, or sick, or in prison and did not minister unto thee?"

By this time, if the teacher has heard of the decision in this case, he realizes that he is getting into deep water. He is reading in school verses from the King James version of the Bible. In the very attempt to explain the Constitution he has infringed it. He should avoid reading such quotations from the dictionary. He may tell the children to always stand up for the Constitution, and, if they do not understand parts of it, to utter the slogan of some professional politicians, "Back to the Constitootion," but not to consult the dictionary about it in the schoolroom, for there they

will encounter quotations of verses and parts of verses from the King James version of the Bible, and the very Constitution which they are studying forbids the reading of "any part" of that Bible in the public schools. Webster's International Dictionary should be excluded from the schools, if we are to be consistent. It may be read at home, or studied in the churches; but in the schools?

The offer of the dedication to the original King James version, which is said to be inimical to the Catholic religion and its Head, was properly excluded. That dedication is no part of the Bible, and so far as has come under my notice it is not commonly included in editions of the so-called King James versions which are printed and published in the United States. Where the copy was procured, from which this dedication was said to be offered, does not appear, and there is certainly no proof in the record that it was a copy used in any of the schools of this state, much less in the school where appellant's son was attending.

The arguments of counsel on both sides have taken a wide range, and much oratory has been expended on the claimed importance of alleged differences between certain passages in the Catholic and Protestant versions of the Bible, but not a single passage where any variation exists had been shown by the record in this case to have been read in this school.

I think the judgment of the trial court should be affirmed.